# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DP-01426-SCT

*ARMON ANDRE RANDALL a/k/a*

*ARMON RANDALL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/21/1998 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL W. CROSBY |
| | JOHN G. HUTCHINSON |
| | JOHN J. KUSTER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| DISTRICT ATTORNEY: | CONO CARNANA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED-09/27/2001 |
| MOTION FOR REHEARING FILED: | 10/26/2001; denied 1/24/2002 |
| MANDATE ISSUED: | 1/31/2002 |

### EN BANC.

### MILLS, JUSTICE, FOR THE COURT:

¶1. On May 28, 1997, Armon Andre Randall was indicted in the Second Judicial District of Harrison County for the capital murder of Eugene Daniels. The indictment also charged four other individuals: Nomdray Stokes, Harry Thomas, Tony Williams, and Veronica Johnson.

¶2. At the conclusion of Randall's trial, which was severed from his co-defendants, the jury returned a guilty verdict. The jury additionally found that Daniel's murder occurred during the commission of a robbery and that Randall had previously been convicted of another capital offense or of a felony involving the use or threat of violence to a person sufficient to impose the death penalty, and thereafter, sentenced Randall to death. Randall's motion for JNOV or a new trial was denied. Aggrieved, Randall has perfected his appeal. He assigns the following points as error:

## ISSUES

## PART ONE

## (GUILT/INNOCENCE PHASE)

## I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING

**TESTIMONY AND ALLOWING ARGUMENT ABOUT ANOTHER JURY'S CAPITAL MURDER CONVICTION OF RANDALL'S CO-INDICTEE, NOMDRAY STOKES, IN CONNECTION WITH EUGENE DANIELS'S DEATH**

**II. THE TRIAL COURT DEPRIVED RANDALL OF THE OPPORTUNITY TO DEFEND HIMSELF BY EXCLUDING CRITICAL EXCULPATORY EVIDENCE.**

**III. THE PROSECUTION ENGAGED IN MISCONDUCT DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL THAT REQUIRES REVERSAL**

**IV. THE COURT COMMITTED REVERSIBLE ERROR BY DENYING RANDALL'S MOTION FOR A DIRECTED VERDICT AND NEW TRIAL**

**V. THE STATE'S FAILURE TO COMMENCE RANDALL'S TRIAL UNTIL FIVE YEARS AFTER THE ALLEGED CRIME DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW**

**VI. RANDALL HAS BEEN DENIED HIS RIGHT TO A MEANINGFUL APPEAL**

**VII. THE ERRORS TAKEN TOGETHER ARE CAUSE FOR A REVERSAL**

**PART TWO**

**(SENTENCING PHASE)**

**I. THE TRIAL COURT'S FAILURE TO EXCLUDE EVIDENCE OF GANG MEMBERSHIP FROM THE PEN PACK CONSTITUTES CONSTITUTIONAL ERROR, REQUIRING REVERSAL OF RANDALL'S DEATH SENTENCE**

**II. THE PROSECUTORIAL MISCONDUCT WHICH OCCURRED DURING THE SENTENCING PHASE OF THE TRIAL REQUIRES THAT RANDALL'S DEATH SENTENCE BE VACATED**

**III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTION TO PRESENT THE UNDERLYING DETAILS OF RANDALL'S PRIOR FELONY CONVICTION WHERE SUCH EVIDENCE WAS NOT NECESSARY TO ESTABLISH THE EXISTENCE OF ANY STATUTORY AGGRAVATING FACTORS**

**IV. THE DEATH SENTENCE IS A DISPROPORTIONATE PENALTY GIVEN THE FACTS AND CIRCUMSTANCES OF THIS CASE AND IS NOT SUPPORTED BY THE JURY'S FINDINGS**

**V. THE ERRORS TAKEN TOGETHER ARE CAUSE FOR REVERSAL**

**FACTS**

¶3. On October 28, 1993, Eugene Daniels and his fiancee, Linda Cowart, were in the Biloxi, Mississippi, apartment the two shared. Sometime around 10:00 p.m. Cowart left the apartment to get chicken wings at a nearby Kentucky Fried Chicken. She returned to the apartment around 20 minutes later. She found the

apartment door unlocked. When she entered, the apartment appeared to be in disarray. She then went to the apartment of an upstairs neighbor, Bruce Johnson, who was a police officer. Although Johnson said he and his wife were at home all night, Cowart said that when she knocked on the door, there was no answer. She next went to a convenience store and placed two calls, one of which was to a good friend, France Brinkley. Cowart asked Brinkley to come to the apartment. Upon his arrival, Brinkley and Cowart entered the apartment. Brinkley discovered the body of Eugene Daniels. Cowart returned to Johnson's apartment, for what she asserted, was the second time. This time, Johnson answered the door. Johnson returned to Daniels's apartment with Cowart and called 911 for emergency assistance after he saw Daniels's body.

¶4. Harry Thomas, Tony Williams, Nomdray Stokes, Armon Randall and Veronica Johnson were indicted for Daniels's death. Johnson, Williams, and Thomas all entered into plea agreements with the State. In exchange for reduced charges, the three defendants agreed to testify at the trials of Nomdray Stokes and Armon Randall. Stokes was convicted of capital murder on September 16, 1998. The jury was unable to reach a unanimous decision in the sentencing phase of his trial, and the trial judge sentenced him to life without the possibility of parole. Randall was convicted for the capital murder of Daniels on November 20, 1998. Randall's jury reached a unanimous verdict and imposed the penalty of death.

## DISCUSSION

## STANDARD OF REVIEW

¶5. "This Court's well-established standard for reviewing an appeal from a capital murder conviction and a death sentence is one of 'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." ***Flowers v. State***, 773 So.2d 309, 317 (Miss. 2000)(citing ***Porter v. State***, 732 So.2d 899, 902 (Miss. 1999)(citing ***Balfour v. State***, 598 So.2d 731, 739 (Miss. 1992)(quoting ***Williamson v. State***, 512 So.2d 868, 872 (Miss. 1987)). "This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" ***Id. See also King v. State***, 784 So.2d 884, 886 (Miss. 2001).

## PART ONE

## (THE GUILT/INNOCENCE PHASE)

### I. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING TESTIMONY AND ALLOWING ARGUMENT ABOUT ANOTHER JURY'S CAPITAL MURDER CONVICTION OF MR. RANDALL'S CO-INDICTEE, NOMDRAY STOKES, IN CONNECTION WITH EUGENE DANIELS'S DEATH.

¶6. Randall asserts the trial court committed reversible error by allowing the prosecution to repeatedly inform the jury that his co-indictee, Nomdray Stokes, was convicted by a separate jury on the same capital murder charge. We agree. "The law is well settled in this state that where two or more persons are jointly indicted for the same offense but are separately tried, a judgment of conviction against one of them is not competent evidence on the trial of the other because such plea of guilty or conviction is no evidence of the guilt of the party being tried." ***McCray v. State***, 293 So.2d 807, 808 (Miss. 1974) (citing ***State v. Thornhill***, 251 Miss. 718, 171 So.2d 308 (1965); ***Pieper v. State***, 242 Miss. 49, 134 So.2d 157 (1961); ***Pickens v. State***, 129 Miss. 191, 91 So. 906 (1922)). We have held that placing this information before a jury denies a defendant the fundamental right to a fair trial, and rises to the level of reversible error.

*See* **Buckley v. State**, 223 So.2d 524 (Miss. 1969); **McCray v. State**, 293 So.2d 807 (Miss. 1974); **Henderson v. State**, 403 So.2d 139 (Miss. 1981); **Johns v. State**, 592 So.2d 86 (Miss. 1991). We have stated the reasoning behind this rule as follows:

> [once a jury is apprized of the fact that a co-defendant has been tried and convicted for the same charge for which the defendant is now on trial, the jury's] ability to objectively reach a fair verdict on the merits of the competent evidence before it [is] necessarily impaired. The jury [is then] placed in the untenable position of pitting its prospective verdict against a guilty verdict previously entered by another jury carrying with it the court's approval by way of the judgment and sentence.

*McCray*, 293 So.2d at 809.

¶7. The language that Randall complains of was spoken by Harry Thomas, one of Randall's co-defendants, during redirect examination. It reads as follows:

> Q. And as it was characterized during cross-examination, Mr. Stokes, when the State tried to convict Nomdray Stokes, when that was asked of you three times, you did appear and testify against him, didn't you?
>
> A. Yes, sir.
>
> Q. Did you testify as to the same thing you said today?
>
> A. To the best of my knowledge, yes, sir.
>
> Q. *And was Nomdray Stokes convicted of being present, participating in capital murder*?
>
> A. *Yes, sir.*
>
> MR. SIMPSON: That's all.

(emphasis added). Randall asserts that further injustice was done by the following statements made by the prosecution during closing arguments:

> BY MR. SIMPSON: It gets worse than that. Veronica Johnson, Tony Williams, and Harry Thomas, who all stood up here with their lawyers on the eve of trial and admitted their guilt and were going to the penitentiary, and then *Nomdray Stokes, who took his chances with 12 citizens like yourself and was found guilty of capital murder*, this grand conspiracy that we all contrive got those people to do that.
>
> \*\*\*
>
> And then, but today, the defense said, it is our theory of the case that none of . . .these people had a thing to do with this. Not Veronica, Tony Williams, Harry Thomas, Nomdray Stokes or the defendant, Armon Randall. Three of them just decided to take the blame, *and the other one has been convicted for his participation, for being present and participating in an armed robbery and murder of Eugene Daniels.*
>
> We came up here and told you in the beginning we are not going to be able to answer every question

you have, but from the evidence you will be convinced, and I suspect are at this point, must be, beyond any reasonable doubt that there are, in fact, the five people. *And Armon Randall is the last of the five people to be accountable for his actions.*

¶8. The State acknowledges that the jury was informed that Nomdray Stokes was convicted on the same capital murder charge for which Randall was on trial, and that normally this would be error as a matter of law. However, it responds first by asserting that counsel for Randall made no objection, and consequently waived this issue for appeal, and secondly, that comments made by Randall's attorney opened the door for the testimony.

## A.

¶9. First, the issue of waiver: "It is incumbent on defense counsel to raise a proper objection when the offensive language is uttered or waive appellate review of the issue. This rule provides the trial court with the opportunity to sustain an objection and admonish the jury to disregard moments after the erroneous language is uttered." *Foster v. State*, 639 So.2d 1263, 1288-89 (Miss. 1994). "If no contemporaneous objection is made, the error, if any, is waived." *Cole v. State*, 525 So.2d 365, 368 (Miss. 1988). "The defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal." *Foster*, 639 So.2d at 1288-89. "This rule's applicability is not diminished in a capital case." *Cole*, 525 So.2d at 368. The State directs our attention to the following arguments in the trial court to support its assertion:

MR. SIMPSON: Your Honor, we approached the bench before we did redirect examination to advise the Court and to also put defense counsel on notice outside the presence of the jury that the State is of the opinion based on defense counsel's repeated comments on the State's attempt to convict Nomdray Stokes, and also reference to the Stokes' trial transcript, and the dates of the trial so forth, specifically his quote on three separate occasions in his cross-examination of the State trying to convict Nomdray, that an inference has been placed before the jury box that the State was unsuccessful. That door has been opened, and we are allowed not only to go into whether or not the witness testified at that trial, but as to the outcome.

THE COURT: Mr. Crosby.

MR. SIMPSON: Not as to any sentence, but as to verdict on guilt or innocence.

MR. CROSBY: *I agree to a stipulation if the State wants to read a stipulation that effect, that, number one, it is hereby stipulated and agreed by the parties that Nomdray Stokes was convicted of capital murder. Number two, that the State did not get the death penalty. Number three, that Armon Randall was not - - Armon Randall's attorney was not involved in that case. I would agree if we read a stipulation just like that.*

MR. SIMPSON: Your Honor, it would be improper as a matter of law, I believe, to introduce to the jury what sentence a prior jury deliberated upon and reached. As to the verdict, it would have also been improper until the defense interjected to them that the State *unsuccessfully* on three different occasions during his cross-examination *failed* to try and convict the defendant, Nomdray Stokes.

THE COURT: All right. Based upon the wording of the questions and questions that Mr. Crosby asked and any response given, I think at this time it - - the door has been opened, it would be

appropriate, and I am going to allow the State to ask Mr. Thomas if, in fact, he testified in the trial of Nomdray Stokes, and if, in fact, Mr. Stokes was convicted of capital murder. That is as far as we are going.

(emphasis added).

¶10. The State asserts that not only did counsel for Randall fail to raise a contemporaneous objection, he offered to stipulate to it. When the State declined to accept the defendant's stipulation, counsel for Randall did not object to the admission of this evidence. While this is so, Randall reminds us of *House v. State*, 445 So.2d 815 (Miss. 1984), where we discussed the meaning of "preserving" an error in the trial court. We said that "[g]enerally, this means that the matter must be presented to the trial court in such a form that the trial judge has the opportunity to consider it with full knowledge of the respective contentions of the parties. On the other hand, where an objection is made and where the basis therefor is obvious from the context, little of value is accomplished by insistence upon a technically correct objection." *Id.* at 819. While Randall did not make a "technically correct objection," the issue of the admissibility of the conviction of Randall's co-defendant was presented to the trial judge. Although it was the State who raised most of the arguments both for and against its admission, Randall could not be said to have actually agreed to its admission. Randall merely offered to agree under limited circumstances.

¶11. Assuming arguendo that Randall did not properly preserve this matter for appeal: "This Court has recognized an exception to procedural bars where a fundamental constitutional right is involved." *Conerly v. State*, 760 So.2d 737, 740 (Miss. 2000). "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions." *Johnson v. State*, 476 So.2d 1195, 1209 (Miss. 1985). *See also Johns v. State*, 592 So.2d 86, 90 (Miss. 1991)(holding testimony that accomplice had been convicted of same offense for which defendant was being tried denied defendant a fair trial, and error could be addressed on appeal even absent a contemporaneous objection). Consequently, under either theory, it is proper for us to address this issue here.

**B.**

¶12. The second question before us asks us to decide if Randall opened the door for Thomas to testify that one of Randall's co-defendants was tried and convicted by a separate jury for the same offense for which Randall was on trial. We questioned the viability of the open door/invited error doctrine in *Williams v. State*, 544 So.2d 782 (Miss. 1987) in light of the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed.2d 231 (1985). The U.S. Supreme Court reversed our decision which affirmed a death sentence holding that defense counsel's argument which misrepresented the nature of a life sentence, invited the district attorney to comment on appellate review of death sentences. The U.S. Supreme Court's decision was based on the principle that the prosecution may not lessen the jury's sense of responsibility by arguing that death sentences are automatically reviewed, and that there was no "rational link" between defense counsel's argument and the prosecutor's response. *Williams* 544 So.2d at 797 (citing *Caldwell*, 472 U.S. at 337, 105 S. Ct. at 2644, 86 L. Ed.2d at 244). In *Williams*, we said:

> In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a

conviction.

*Id.* (citing *Booker v. Mississippi*, 511 So.2d 1329, 1331 (Miss. 1987)). Our concerns with the open door/invited error doctrine emanated from our concerns with not wishing to run awry of the federal constitution. We said:

> In spite of the holding of *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed.2d 1 (1985) [applying invited error doctrine to uphold conviction], *Caldwell v. Mississippi* still casts doubt on the viability of the opened door/invited error doctrine in the context of a capital sentencing trial. The *Caldwell v. Mississippi* holding is rooted in the Eighth Amendment and the majority opinion in that case cautions that "such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding so as to violate the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. at 340, 105 S. Ct. At 2645, 86 L. Ed.2d at 246 (1985). The court has often cautioned that "death is different" and this may be one context in which this is so.

*Williams*, 544 So.2d at 797-98.

¶13. By way of contrast, in *Doby v. State*, 557 So.2d 533 (Miss. 1990), we applied the open door/invited error doctrine to uphold the trial court's finding that defense counsel had opened the door for the prosecutor's comments regarding the defendant's failure to subpoena a confidential informant. We said:

> *Jefferson v. State*, 386 So.2d 200, 202 (Miss. 1980) is authority for the proposition that where opposing counsel "opens the door," the prosecution may enter and develop a matter in great detail. 386 So.2d at 202. If a defendant opens the door to line of testimony, ordinarily he may not complain about the prosecutor's decision to accept the benevolent invitation to cross the threshold. *United States v. Delk*, 586 F.2d 513 (5th Cir. 1978). In this sense Doby's wound may certainly be regarded as self-inflicted. *See Lewis v. State*, 445 So.2d 1387 (Miss. 1984); *Jackson v. State*, 423 So.2d 129 (Miss. 1982); *Reddix v. State*, 381 So.2d 999, 1009 (Miss. 1980). ["If the defendant goes fishing in the state's waters, he must take such fish as he catches."] *Heafner v. State*, 196 Miss. 430, 437, 17 So.2d 806, 808 (1944) and *Archer v. State*, 140 Miss. 597, 609, 105 So. 747, 748 (1925) recognize these premises in today's context.

*Id.* at 539. However, there are two marked differences between *Doby* and the case at bar. First, and most importantly, *Doby* was not a capital case. The defendant in *Doby* was appealing a conviction for the unlawful sale of cocaine. Secondly, the testimony in *Doby* clearly invited the prosecutor's remarks. On cross-examination counsel for the defense specifically asked an undercover agent for the Mississippi Bureau of Narcotics if she could have subpoenaed a confidential informant to testify at trial. *Id.* at 538. When the agent responded that she couldn't have subpoenaed the informant, but that the District Attorney's office or the defense attorney could have, counsel for the defense then asked "If the confidential informant was here that confidential informant could verify what you say happened, couldn't she?" *Id.* To which question, the agent answered yes. Based on these questions by the defense, we held that the prosecutor's statement during closing arguments that the state, as well as the defense, both had the power of subpoena, was invited.

¶14. The State directs our attention to *Blue v. State*, 674 So.2d 1184 (Miss. 1996)(overruled on other grounds) to support its argument that defense counsel can open the door for the introduction of evidence which would otherwise be inadmissible. The appellant in *Blue* was convicted of capital murder and

sentenced to death. One of the issues he raised on appeal was that the prosecutor improperly commented on facts not in evidence. *Id.* at 1207. We first found this argument procedurally barred because the defense had failed to make a contemporaneous objection at trial. *Id.* However, we addressed the issue on its merits despite the procedural bar. We did, as the State now points out, find that defense counsel had opened the door for the prosecutor's comments. Although we applied this doctrine in a capital context, defense counsel clearly opened the door. In his closing argument, defense counsel harped on the lack of judicial action taken against the defendant's two accomplices. *Id.* When the prosecutor gave his closing argument, he stated that the two accomplices were not being tried because the judge determined the State "lacked enough proof to try them." *Id.* We held that the prosecutor's statement "was only a response to defense counsel's statements." *Id.* Turning to the present case, Randall did not open the door for the introduction of Stokes's conviction, and assuming arguendo that he did, the prosecution exceeded any proper boundaries. The following is an excerpt from the colloquy between Harry Thomas and counsel for Randall which the State asserts opened the door:

> Q. And in the trial - - in the trial of Nomdray Stokes, when they were *trying to convict* Nomdray, you remember testifying, right.
>
> A. Yes, sir.
>
> Q. And page 135 and 136 of the trial transcript, I believe that - - and they were trying to say, they were *trying to convict* Nomdray at that time, and you were testifying against Nomdray, right?
>
> A. Yes, sir.
>
> \*\*\*
>
> Q. Now, I ask you again, isn't it true that whenever they were *trying to convict* Nomdray Stokes of this case that your testimony was that Nomdray was on the left side of Mr. Daniels?

(emphasis added). The State's main contention is that this line of questioning left the jury with the impression that the State tried to convict Stokes of this crime, but was unsuccessful. Contrary to the State's argument before the trial judge, Randall never stated that the State tried and "failed" to convict Nomdray Stokes, nor did Randall say that the State was "unsuccessful" in its attempt to convict Stokes. When Randall's questions are read in context, it is apparent that he was trying to demonstrate that Harry Thomas's testimony contained discrepancies and had changed since his previous testimony in the Stokes trial. Thomas testified on direct examination that before the defendants went to Daniels's apartment, they mistakenly went to another apartment instead. He further testified that they attempted to break in to this apartment until they realized that they were at the wrong apartment. Randall attempted to impeach Thomas's testimony by demonstrating that he had given his version of events both in his plea and in his testimony in the Stokes trial, and that this was the first time he had ever mentioned going to the wrong apartment before going to Daniel's. Randall also attempted to show that this was the first time Thomas had ever mentioned attempting to break in to the wrong apartment, using a barbecue grill or flower pot. Randall additionally attempted to impeach Thomas's testimony by demonstrating that at the Stokes' trial he testified that Stokes came from the bedroom and approached Daniels from the right side, while he had conversely just testified on direct examination that Stokes was on Daniels's left.

¶15. It is also worthy to note that the State made no contemporaneous objection(s) to defense counsel's

use of the words "trying to convict" on any of the three occasions that phrase was used. Neither did the State ask the trial judge for a curative instruction. Randall reminds us that "the prosecutors' preferred remedy for the defense foray should have been a timely objection, not to lie back in the bushes and seize upon this as an opportunity to offer otherwise impermissible and prejudicial argument." ***Doby v. State***, 557 So.2d 533, 539 n.4 (Miss. 1990)(citing ***Ponthieux v. State***, 532 So.2d 1239, 1246-47 (Miss. 1988); ***Murphy v. State***, 453 So.2d 1290, 1294 (Miss. 1988)). Randall also directs our attention to cases in other jurisdictions applying this same rule to reject arguments similar to the case at bar i.e. that defense counsel opened the door for the introduction of otherwise impermissible testimony. *See* ***State v. Butler***, 739 A.2d 732 (Conn. App. Ct. 1999); *cf.* ***United States v. Napue***, 834 F.2d 1311, 1324 (7th Cir. 1987); ***Terry v. Maryland***, 631 A.2d 424 (Md. Ct. App. 1993) .

¶16. In response to the attack against the statements it made during closing arguments, the State urges that they were proper under our rule that "a prosecutor may comment on any facts introduced into evidence." ***Evans v. State***, 725 So.2d 613, 672 (Miss. 1997). Fairness and logic, however, deny application of such a notion when the facts were improperly introduced. Such an argument is simply disingenuous.

¶17. While this is admittedly a close call as to whether the questions by the defense actually suggested the outcome of the Stokes trial was unsuccessful, the rule in this State is clear: death is different. In capital cases, all bona fide doubts are resolved in favor of the defendant. It was reversible error to allow Thomas to testify as to the outcome of the Stokes trial. This error was compounded by the egregious exploitation of the improperly admitted information during closing arguments. While the door may have been open, the screen door was still closed. The State should not take the bait. This error alone warrants reversal.

## II. THE TRIAL COURT DEPRIVED RANDALL OF THE OPPORTUNITY TO DEFEND HIMSELF BY EXCLUDING CRITICAL EXCULPATORY EVIDENCE.

¶18. Randall's next point of error asserts that the trial court erred by excluding (1) the exculpatory testimonial evidence of Liberty Van Court and (2) physical evidence found in Daniels's apartment. Randall asserts both of these were "essential" to his defense, and that their exclusion deprived him of his right under Article 3, §§ 14 and 26 of the Mississippi Constitution to present all relevant evidence tending to exonerate him. We agree.

### 1. Whether the Court Below Erred in Light of Mr. Randall's Showing at Trial in Excluding Ms. Van Court's Statements Pursuant to Mississippi Rule of Evidence 804(b)(5).

### A. Whether the Trial Court Committed Reversible Error in Not Admitting, Pursuant to Mississippi Rule of Evidence 804(B)(5), Liberty Van Court's Consistent, Contemporaneous, and Exculpatory Statements to the Police.

¶19. Randall reminds us of our decision in ***Terry v. State***, 718 So.2d 1115 (Miss. 1998), where we addressed an embezzlement defendant's argument that it was fundamentally unfair for the trial judge to exclude evidence that another person had taken the money that she was accused of embezzling. We agreed and said:

> In ***Kennedy v. State***, 278 So.2d 404, 406 (Miss. 1973), this Court held when an accused is being tried for a serious offense, the jury is entitled to hear any testimony that the appellant might have in the way of an alibi or defense. This Court ruled in ***Love v. State***, 441 So.2d 1353, 1356 (Miss. 1983),

that litigants in all cases, including defendants in criminal prosecutions, are entitled to assert alternative theories, even inconsistent alternative theories. *A criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory.* **Keys v. State**, 635 So.2d 845, 848-49 (Miss. 1994).

*Terry*, 718 So.2d at 1121 (emphasis added). However, such a pronouncement is not an exception to other rules of law. We also said that any evidence proposed to be introduced under this rule "must first comply with the Mississippi Rules of Evidence." *Id.* at 1122.

¶20. Liberty Van Court lived in the same apartment complex, although not in the same apartment building, as Daniels and Cowart. On the evening of the murder, Van Court gave two statements to police. She gave the first statement at the scene to Gerald Forbes, an investigator with the Biloxi Police Department. According to Investigator Forbes's report, Van Court saw "two black males running in an easterly direction near the office." Forbes's report further states that: "Ms Van Court said that both wore *flannel shirts* and ball caps turned backwards" (emphasis added).

¶21. Roughly three hours later, Van Court gave a tape-recorded statement at the police station before Investigator James Banta. The substance of the second statement corresponded with the first. Van Court told Investigator Banta that earlier that evening, as she was walking to her car in the parking lot she had seen "two skinny, tall, black guys" that were wearing their "hats on backwards, *flannel shirts*, jeans, like normal kids goofing around." (emphasis added). When she saw them, "they were running towards the front of the [apartment] complex." . She did not see their faces, but she asserted that she would be able to identify the two individuals if she saw them again "if they were in the same clothing." Randall emphasizes that the Biloxi Police Department used these two statements to prepare the first news release concerning the crime.

¶22. Randall asserts Van Court's statements were fundamental to his defense. Police investigating the murder scene found a piece of torn flannel near Daniel's body. It was uncontested that Cowart was a meticulous housekeeper. However, when police asked Cowart about this flannel, she stated that neither she nor Daniels had any clothing that matched the flannel at the crime scene. As Randall correctly notes, none of the co-defendants who testified against him could identify this fabric either. Thus, the defense theory of the case was that it was not Randall and his co-defendants, but these two unidentified males who murdered Daniels and left behind the torn piece of flannel.

¶23. Randall sought to have Van Court's statement admitted pursuant to Mississippi Rule of Evidence 804(b)(5), which provides:

(b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as witness:

(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

¶24. In **Butler v. State**, 702 So.2d 125 (Miss. 1997), we said that five conditions must be met before evidence is admissible pursuant to Rule 804(b)(5): "(1) The adverse party must have notice of intended use; (2) The statement must have circumstantial guarantees of trustworthiness; (3) It must be offered as evidence of a material fact; (4) It must be more probative than other evidence; and (5) The purpose of the rules and the interests of justice must be best served by admitting the statement." **Id.** at 128. These five requirements are stated conjunctively. Therefore each must be met before the hearsay may properly be admitted. **Id.**

¶25. Randall has addressed each of these requirements separately. We do likewise.

### (a) Unavailability

¶26. Mississippi Rule of Evidence 804(a)(5) defines a declarant as being unavailable when the declarant "is absent from the hearing and the proponent of this statement has been unable to procure his attendance. . .by process or other reasonable means." The trial judge found that Randall had not exercised due diligence in trying to locate and serve a subpoena on Van Court. His ruling on the unavailability portion reads as follows:

> THE COURT: Okay. As to the first issue, the Court is of the opinion that the formal request, i.e., request of subpoenas to have the two individuals served - - formally served with process is - - was not timely made.
>
> Second, the Court is of the opinion regarding the testimony of the investigator that he basically started looking for and trying to find these two witnesses. The Court is of the opinion that that does not constitute due diligence.
>
> As to the testimony of and the availability of Van Court, it appears that she had already moved back to Germany quite sometime ago, was not available and will not be available. So there is no way - - it does not appear that Van Court was ever going to be formally served with process after she apparently moved back to Germany. That is the conclusion the investigator came up with.

¶27. Before proceeding further, it is important to note that although the trial judge found that Randall did not exercise due diligence, his ruling did not rest on that finding. He also said:

> Having said all that, *I don't think any of that matters*. I just don't think whether or not due diligence was attained matters because the third test is whether or not there is an indicia of reliability. . .A mere statement by a police officer - -excuse me, to a police officer, I don't think satisfies the equivalent circumstantial guarantees of trustworthiness that 804(b), one through four have.

(emphasis added).

¶28. Revere Christophe was the private investigator employed to search for witnesses on behalf of Randall. When prompted by defense counsel's question as to how long he had been "trying to secure [Van Court's] attendance" for Randall's trial, Christophe responded "since before the Tony Williams trial, which is one of the co-defendants in this case." Christophe had also been employed as a private investigator to locate and serve subpoenas on witnesses for the Williams trial. Williams's trial was set to begin roughly three months before Randall's trial. In his efforts to locate Van Court for that trial, Christophe stated that he interviewed some of Van Court's former neighbors and her former apartment manager to assist him in determining her location. These individuals informed him that she and her husband "were of foreign dissent" and that "they

[had] moved out of the state and possibly out of the country. Either back to Germany where he is from, or to Canada." Christophe also consulted the witness list which listed a physical address for Van Court. When he went to the address listed, he learned that she had not lived at that address for a year or two. Christophe further consulted phone records to determine if she had applied for a telephone number. He found no published record of her telephone number.

¶29. When Christophe was employed to locate witnesses for Randall's trial, he rechecked the same information on Van Court except for speaking with the apartment manager. He rechecked the phone book, directory assistance, the cris-cross directories, national directory assistance, and the Register of Voters at City Hall. He additionally checked what appears to be two separate computer data bases that he subscribes to through his business.

¶30. The problem in the trial court seems to be that Christophe was not issued a subpoena for Van Court until the week preceding Randall's trial. In its argument before the trial judge, the State stressed that he did not begin "to start locating this witness on behalf of this defendant, anyway, [until] sometime at the beginning of last week." The State concluded that his efforts could not satisfy the due diligence requirement because Randall had known of Van Court's tape-recorded statement for years, but had not obtained a subpoena for her until the week before Randall's trial. The trial court's ruling, *supra*, seems to agree. However, the record reflects that on redirect examination Christophe agreed that once he did receive the subpoena, his investigation merely picked up from where he had started in the prior months. He also agreed that, based on his previous efforts, he was satisfied *before he even began the search for Van Court on Randall's behalf* that Van Court was going to be unavailable. Randall reminds us of ***Mitchell v. State***, 572 So.2d 865 (Miss. 1990), where we said the burden "is to demonstrate diligent effort, not to do everything conceivable."***Id.*** at 869. We find that Christophe did exercise due diligence and did attempt to procure Van Court's presence by process or reasonable means.

### (b) Notice

¶31. Although the trial judge did not mention the element of notice in his ruling, the arguments before him did address this issue. The State argued, inter alia, that it did not receive sufficient notice because Randall did not attempt to introduce Van Court's statement until the first day of trial. The State asserted before the trial court that this Court's decision in ***Cummins v. State***, 515 So.2d 869 (Miss. 1987)(overruled on other grounds), held that one day's notice was not sufficient. Indeed, we did. ***Id.*** at 874. In ***Cummins***, the State attempted to subpoena a witness two days before trial. The subpoena was returned unexecuted, and the State then gave notice that it would attempt to introduce an oral statement one day before trial. The trial judge allowed the introduction of the statement. We reversed. However, not only did the defendant have no notice until the day before trial, "the hearsay evidence offered. . .exceeded the scope of the notice given." ***Id.*** We then said that *"to the extent that the evidence offered at trial exceeded the scope of the notice given to defendant*, the defendant was denied a fair opportunity to contest the admissibility of the evidence."***Id.*** (emphasis added).

¶32. We also said:

> The residual exceptions to the hearsay rule require that the proponent of evidence to be offered must give notice to the party against whom the evidence is to be offered. This notice should be given "sufficiently in advance of the trial or hearing to provide. . .a fair opportunity to meet it. . ." ***United States v. Mathis***, 559 F.2d 294, 299 (5th Cir. 1977). It should be determined by the trial judge

whether the notice given was sufficient. *Great latitude is usually allowed depending on the facts and circumstances of each case and the context in which the evidence arises. United States v. One 1968 Piper Navajo Twin Engine Aircraft*, 594 F.2d 1040, 1041 (5th Cir. 1979); *United States v. Davis*, 571 F.2d 1354 (5th Cir. 1978)l *United States v. Leslie*, 542 F.2d 285 (5th Cir. 1976). Only the second circuit has applied a rigid standard in determining if the notice requirement was met. (citation omitted).

515 So.2d at 873-74 (emphasis added).

¶33. Our Court of Appeals recently applied this espousal in *Thomas v. State*, 1999-KA-01744-COA, 2001 WL 35987 (Miss. Ct. App. Jan. 16, 2001). The defendant in *Thomas* was convicted of manslaughter and shooting into an automobile. His justification was *self-defense*. He sought to introduce the statement of an individual that would corroborate defendant's knowledge of the victim's cocain usage. The State claimed both that the statement was not probative and that the defense had failed to give adequate notice. The Court of Appeals referred to our decision in *Cummins* and said that "one day notice before trial was not sufficient for providing notice under the residual exception to the hearsay rule." *Id.* at ¶8. However, the court also noted that "while [the proffered oral statements] to [defendant] were not admitted, there was, nevertheless, testimony before the jury from Dr. Hayne about the victim's prior use of cocaine." *Id.* at ¶11. Additionally, the court also found that the exclusion of the statements did not prevent the defendant from testifying as to his fear of the victim *in furtherance of his defense*. *Id.* at ¶14. Thus, the information the defendant sought to place before the jury actually was submitted, although it was from a different source. Importantly, he was not hindered in the presentation of his self-defense justification.

¶34. Turning to the present case, Randall asserts that the State had actual notice of Van Court's statements well before defense counsel "because the State, not Mr. Randall, took the statements from Ms. Van Court and produced those statements to Mr. Randall in pre-trial discovery." Randall further asserts that the prosecutor's arguments before the trial judge show that the State did have sufficient notice. He argues in his brief that: "The prosecutor asserted that 'the testimony' and 'the discovery' in this case put Mr. Randall 'on notice' of Ms. Van Court's statements 'for many months, in fact, [many] years.' Clearly if Mr. Randall was 'on notice' for 'years' about the Van Court statements, then so too was the State."

¶35. The State concedes in its brief that "[t]he record indicates that this issue was argued and discussed throughout the trial."[(1)] Although the State asserted the first time it was put on notice of Randall's intent to use Van Court's statement was on the first day of trial, the trial judge initially excluded only Randall's reference to it during opening statements. He reserved ruling on the ultimate admissibility of the statement, not rendering his final judgment until the fourth day of trial. This four-day window gave the State ample time to fairly prepare to meet the introduction of the statement. In fact, in oral argument before this Court, the State conceded that by the time this ruling was made, the State had in fact prepared to meet the evidence.

¶36. The defendant in *Parker v. State*, 606 So.2d 1132 (Miss. 1992) was convicted of the murder of Rachael Morgan. A rape kit performed on Morgan's body revealed the presence of DNA from two men, Michael Parker, the defendant, and Michael McDougal, the victim's boyfriend. Parker sought to introduce a statement the victim made to her life-long friend, Magdalene McCarty, that she was afraid Mike was going to beat her because she had been with another man. *Id.* at 1138. McCarty believed the victim was referring to Michael McDougal, the victim's boyfriend (thus, not in reference to Michael Parker, the defendant). The trial judge attempted to cure the defendant's technical violation of the notice requirement by granting an

overnight continuance. However, the judge excluded the statement because he did not think the statement satisfied the trustworthiness requirement. We held the that the trial judge abused his discretion by excluding this statement and reversed. *Id.* at 1139. While our decision mainly turned on the element of trustworthiness, we did confront the element of notice. We said that "[a]lthough the technical requirements of the Rule regarding notice were not met, the judge attempted to cure this by granting a continuance. *(Additionally, the prosecution did have **actual notice** of the statement, albeit not as a result of the defense stating it planned to use the hearsay at trial*.)"*Id.* (emphasis added). Such is the case here.

¶37. The State had actual notice of Van Court's statement for years. It can hardly be argued otherwise: the State provided the officer's report, as well as the tape-recorded statement, to Randall during pretrial discovery. Because the State knew of these statements for this extended period of time, four days was sufficient opportunity for the State to prepare to meet the introduction of this statement. When the State is on actual notice, we will not allow technical violations to override fundamental fairness. The State did not demonstrate any harm or prejudice resulting from noncompliance with technicalities; consequently, fundamental fairness prevails.

### (c) Testimonial Trustworthiness

¶38. The hearsay statement offered must have "circumstantial guarantees of trustworthiness." *Cummins v. State*, 515 So.2d at 874 (quoting *United States v. Ruppel*, 666 F.2d 261, 271 (5th Cir. 1982)). "The trial judge must find that the evidence offered is as trustworthy as that which could be offered under the 23 specified exceptions listed in Rule 803." *Id.* "Other factors considered are whether the statement was written or oral, the character of the statement, the relationship of the parties, the motivation of the declarant in making the statement, and the circumstance under which the statement was made." *Id.* (citing *Weinstein*, Evidence, Volume 4, Page 803-376 (1985)).

¶39. The State argued that Randall failed to demonstrate any indicia of reliability. The State also referred to the testimony of the investigator who took the first written statement from Van Court when he said that "I have no way of judging the accuracy, whether it is positive or negative. I simply document what people tell me." The trial judge apparently agreed. His ruling rested primarily on his belief that Van Court's statements lacked the requisite guarantees of trustworthiness. He said:

> A relatively new exception is number five under other exceptions. But it refers back to the basic test that you look at under 804(b), one through four. It starts out by stating, a statement not specifically covered by any of the foregoing exceptions, but having equivalent circumstantial guarantees of trustworthiness.

> A mere statement by a police officer--excuse me, to a police officer, I don't think satisfies the equivalent circumstantial guarantees of trustworthiness that 804(b), one through four have. Those are very strict, very limited, and the reason for that is obvious, without having to say it.

> However, under the comment section under 803, subsection 24, and that is a hearsay exception rule. 24 is basically the identical other exceptions statement as is in 804(b)(5). The comment under that section does admit that the rule reflects the realization that the law is not stagnant. I agree with that. And it should allow for the further development of the law when the guarantees of reliability and trustworthiness can be found.

This is the important part in the Court's opinion: While these rules do allow for judicial discretion, they do not permit an unfettered discretion, which could ultimately devour the hearsay rule.

It is the Court's opinion that hopefully the evidentiary rules have not been so relaxed to the point where basically just statements can go into evidence. It deprives the other side of cross-examination[2], and the Court does not find that there is sufficient indicia of reliability as is required and accepted in the other exceptions under 804(b) one through four.

¶40. The trial court characterized Van Court's statement as merely "a statement made to a police officer." To Randall's defense this mere statement was much more. Randall needed this evidence for his defense. We have held that "[i]n determining whether the proffered hearsay has circumstantial guarantees of trustworthiness, *need is a proper factor*."***Parker v. State***, 606 So.2d 1132, 1139(Miss. 1992)(emphasis added)(citing ***Leatherwood v. State***, 548 So.2d 389, 401 (Miss. 1989)). "Need, however, must be balanced against the trustworthiness of the evidence." ***Id.***

¶41. We find that Van Court's statement possessed sufficient circumstantial guarantees of trustworthiness to allow its admission. Van Court gave two statements which were the same in substance. These statements were given on the same evening that she saw the two unidentified black males running in the parking lot, and the statements were given within approximately three hours of each other. She did not change her account of the events nor did she alter her description of the two males. There is nothing in the record to indicate that Van Court had a relationship with any of the co-defendants, or with Randall in particular. There is nothing in the record to indicate Van Court had any relationship to the State or any of the State's witnesses. Further, there is nothing in the record to indicate that Van Court would have any particular motive for giving these statements to the police. Additionally, this evidence was not developed by Randall. There is a circumstantial guarantee of trustworthiness in the simple fact that the origin of this information was from the State whose position and interests were diametrically opposed to those of Randall. Further, the fat that the Van Court statements dove-tailed with other evidence offered, i.e. the pieces of flannel weighs heavily in favor of trustworthiness.

¶42. An explanation for the flannel found near Daniels's body was crucial to Randall's defense. None of the other witnesses who testified could explain the origin of this material. Although the trial court opined that Randall's argument that this piece of flannel had come from the shirt of one of the two unidentified males was "a rather broad assumption," the jury should have been afforded the opportunity to decide how much weight, if any, to place on Van Court's statement and how much credibility to attach to it.

### (d) Probative Value, Materiality, and Interests of Justice

¶43. The central issue in regard to Van Court's statement all boils down to materiality. In fact, the State's main opposition to the introduction of this statement before us is that it is "devoid of probative value." The State argues that the statement does not indicate at what time Van Court saw these two males and further, that she did not see their faces. The State asserts that "[t]he fact that she saw two 'hooligans' in the neighborhood sometime after 7:00 that night is probative of nothing." The State further clings to the trial court's comment that Randall's assertion that the unidentified piece of torn flannel from the crime scene came from the shirt of one of these two males "is a rather broad assumption." We disagree. This information was material, and the State's arguments regarding the deficiencies are the proper subject for cross-examination.

¶44. As Randall argues, it was not the faces of these two unidentified males that rendered this statement

probative. The probative point is that they were wearing *flannel* shirts. Van Court stated that the two males she saw running through the parking lot sometime after 7:00 p.m. the night of the murder were wearing flannel shirts. No one else was able to explain or account for the flannel material found at the crime scene. The victim's live-in girl friend testified that neither she nor the victim had any clothing that matched this piece of fabric and that she had no idea where it came from. Neither were the State's own witnesses able to explain or account for it. It was probative to Randall's defense that it was someone else, and not himself, who murdered Daniels. If this line of argument was a rather broad assumption, that was a question of fact for the jury to decide.

¶45. Further, this information was not available to Randall from any other source. We have already said that need is a proper factor to consider. *Parker v. State*, 606 So.2d at 1139 (citing *Leatherwood v. State*, 548 So.2d at 401). When Randall's need for this information is balanced against the other factors already discussed, we find that the introduction of the Van Court statements would comport with the interests of justice. Consequently, the trial judge abused his discretion by excluding the Van Court statement.

¶46. Randall also states in a footnote that he additionally sought the introduction of the statements pursuant to Mississippi Rules of Evidence 803(1) & (2). The trial court ruled that these two exceptions, present sense impression and excited utterance, respectively, did not apply. We agree.

¶47. A present sense impression is "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Miss. R. Evid. 803(1). With the present sense impression, "spontaneity is the essential factor." *Id.* cmt. *See also Evans v. State*, 547 So.2d 38, 41 (Miss. 1989). The comments further provide that it is "the theory that the contemporaneous occurrence of the event and the statement render it unlikely that the declarant made a deliberate or conscious misrepresentation. Precise contemporaneity of the event and the statement may not be possible; a slight lapse may be permissible."

¶48. While there is nothing in the record to indicate any type of bias on the part of Van Court or any motive for the manufacture of her statements, these statements do not satisfy the spontaneity requirement. Van Court did not give her description of the two individuals while she was perceiving them in the parking lot. She gave her first statement to police approximately three hours after perceiving the event in question. We have held that police questioning, in and of itself, does not automatically nullify the spontaneity of a statement. *Sanders v. State*, 586 So.2d 792, 795 (Miss. 1991). *But see Edwards v. State*, 736 So.2d 475, 478-79 (Miss. Ct. App. 1999)(holding that by its definition a witness' response to an officer's question cannot be spontaneous no matter how soon it is made after the event because the statement will not be a self-generated statement, but a police generated one.) However, there is nothing in the record demonstrating that Van Court gave her account as the result of anything other than police questioning. When this is coupled with the three-hour time lapse, Van Court's statement cannot be said to be either contemporaneous or spontaneous.

¶49. An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Miss. R. Evid. 803(2). Spontaneity is similarly the key with this exception. Rule 803, comment. There is nothing in the record to indicate Van Court ever experienced stress or excitement. Quite to the contrary, she apparently did not think anything was out of the ordinary until the police began to question her. By the exception's own terms, Van Court's statements are not excited utterances as there was nothing "excited" about them. Consequently, Randall's

assertion that the statements were admissible under both Rule 803(1) & (2) is without merit.

### B. Whether the Trial Court Committed Reversible Error by Failing to Admit Evidence of the Cocaine Straw Found in Mr. Daniels's Apartment

¶50. Randall next asserts that the trial judge committed reversible error by excluding evidence of a straw found in the victim's apartment. The straw tested positive for the presence of cocaine. Randall's theory was that Daniels' murder was a drug-related crime. The trial court excluded this evidence believing there was nothing in the record to make its introduction relevant. Randall asserts that this was an abuse of discretion. We disagree.

¶51. We review the admission or exclusion of evidence under the abuse of discretion standard. *Stallworth v. State*, No. 1999-KA-01777-SCT, 2001 WL 225944, ¶8 (Miss. March 8, 2001)(citing *Floyd v. City of Crystal Springs*, 749 So.2d 110, 113 (Miss. 1999)). Miss. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The comments to Rule 401 make clear that "[i]f the evidence has any probative value at all, the rule favors its admission."

¶52. Randall begins his argument by referring to the State's remarks during opening arguments. The State was explaining the testimony it expected Jamikia Ramsey to provide and said:

> She is an important witness. The reason to break in Mr. Daniel and Miss Linda Cowart's apartment as they developed this at the Sahara Hotel was, in their opinion, because they have such a nice place that they live in, they have got a real nice apartment, that *they are selling dope*, and they got a ton of money.
>
> \*\*\*
>
> Jamikia will explain that this case is really all about dreams. It is really all about *they thought there was dope and money in this house*. That how can these people that have average jobs, that work just like everybody else, could have such a nice place if they are not out there selling drugs.

(emphasis added). According to Randall, this opening statement was only a prelude of what was to come, that the State consistently and falsely referred to the lack of drugs found in the apartment, and that the jury was thus mislead. Randall offers a menagerie of facts found in the record excerpts to bolster this argument. For example, he refers to Gerald Forbes's report that Chief Officer Tommy Moffett "had received confidential information that Mr. Daniels and Ms. Cowart were involved in the sale of cocaine. Chief Moffett had also received [intelligence] from another law enforcement agency that had previously attempted to make a case on Daniels and Cowart." Randall also relies on information provided by a "jailhouse snitch" that the people responsible for Daniels's murder, after killing Daniels, additionally stole 1/4 kilo of cocaine from the apartment. This same informant additionally told police that Cowart herself was responsible for the robbery and that she "left the apartment door open for the suspect when she left to go get the chicken." Lastly, Randall directs our attention to Cowart's own statement that Daniels and his friends occasionally purchased cocaine and would "toot a line or two." Thus, according to Randall, evidence that a straw found in the apartment tested positive for cocaine was relevant to demonstrate that Daniels's murder was drug-related and that the killer(s) had found and/or used cocaine at the apartment. Randall asserts that this was also relevant to show that Randall's co-defendants had lied about the conspiracy in order to receive

favorable treatment for themselves in their respective plea agreements and avoid the death penalty.

¶53. When the trial court asked counsel for Randall how the straw was relevant, he replied:

> Well, he did find it in the room, and there is a statement from one of the jailhouse snitches that said - - gave a different version about the door being kicked in, and that the defendant was using cocaine at the time, and that there is an allegation that Linda Cowart was involved by one of the jailhouse snitches. In other words, said she was there and conspired with it, and I think that all ties in together.

¶54. However, as the State points out, this information from the record excerpts was not before the jury. As the State further argues, the trial court's ruling merely stated that he did not think that it was relevant, and would be excluded *"at this time*." (emphasis added). Thus, the door was open for Randall to later introduce this straw into evidence once he established its relevancy. Randall correctly cites to our decision in *Terry v. State,* 718 So.2d 1115 (Miss. 1998), where we said that "[a] criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Id.* at 1121 (citing *Keys v. State*, 635 So.2d 845, 848-49 (Miss. 1994)). However, *Terry* is not an exception to our evidentiary rules. The trial judge did not abuse his discretion by not allowing the evidence of the straw before the jury at that time. The introduction of the straw into evidence was relevant, but only became so to rebut the State's theory that Daniels (and Cowart) were the innocent victims of a lawless, drug-using group of people who mistakenly thought they would find drugs in the apartment. However, Randall failed to raise a contemporaneous objection to any of the "repeated" times the prosecution referred to the absence of drugs. "This Court has said many times over that 'failure to object at trial and failure to include the reference in the motion for a new trial obviates [defendants'] ability to assign the comments as error.'" *Burns v. State*, 729 So.2d 203, 229 (Miss. 1999). Neither did Randall attempt to introduce the straw *for the purpose of rebutting* the State's remarks. This argument is both procedurally barred and, alternatively, without merit.

### III. WHETHER THE PROSECUTION ENGAGED IN MISCONDUCT DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL THAT REQUIRES REVERSAL

#### A. Whether the Prosecution's Repeated References to Witnesses Not Called By the Defense Constitute Reversible Error

¶55. Randall's next assignment of error lies with the following remarks made by the State:

> MR. SIMPSON: Let me tell you what the defense told you in the opening statements. They told you they were going to call Corwin (sic) Williams. Talk about a movie script. At the time they listed him as a witness they knew he was dead. He was shot in the head in New Orleans. This boy wasn't ever going to come in here and give testimony. They told you Kim Williams, Chris Fair, France Brinkley,. Mr. Brinkley, all of a sudden, didn't have a gunshot residue on his hands.

> MR. CROSBY: Objection. Potential witnesses in a case are not required to be called, and it is unfair to draw speculation as to what witnesses is equally available to either side may say.

> THE COURT: I agree. Let's move on.

> MR. SIMPSON: There were 24 potential witnesses listed. You didn't hear from a one of them. Not one.

MR. CROSBY: Same objection, Your Honor.

THE COURT: Let's move on, Mr. Simpson.

MR. SIMPSON: The only evidence you heard from was from the State of Mississippi.

¶56. Randall reminds us that

"[T]he failure of either party to examine a witness equally accessible to both is not a proper subject for comment before a jury by either of the parties. (Internal citations omitted). "Because of the high potential for prejudice to the accused, this rule has been strictly enforced in criminal cases." *Id.* (internal citations omitted). Additionally, this Court has not been hesitant to reverse when such comments are joined by other unrelated sources of prejudice to the defendant.

*Griffin v. State*, 533 So.2d 444, 449 (Miss. 1988).

¶57. The State asserts that because Randall did not move for a mistrial, that he is now procedurally barred from raising this issues before us. However, as Randall correctly states, we have previously said that "in cases of prosecutorial misconduct, we have held 'this Court has not been constrained from considering the merits of the alleged prejudice by the fact that objections were made and sustained, or that no objections were made.'" *Mickell v. State*, 735 So.2d 1031, 1035 (Miss. 1999). Due to the repeated nature of the prosecutor's conduct in this case, the State's waiver argument is without merit.

¶58. The State concedes that it did comment on the witnesses not called by the defendant, and does not dispute that the witnesses were equally available to both sides. However, the State argues that these comments were but merely a "hasty observation. . .made in the heat of the day," and therefore, harmless. *Evans v. State,* 725 So.2d at 676 (Miss. 1997). The State additionally argues that Randall was not denied a fundamentally fair trial when these comments are viewed "in light of the entire trial." *Lockett v. State*, 517 So.2d 1317, 1333 (Miss. 1987).

¶59. We examined the effect such comments have during the course of trial and the remedies we would afford in *Burke v. State*, 576 So.2d 1239 (Miss. 1991), where we said:

This Court has held that where there is substantial evidence supporting the defendant's guilt, a prosecutor's comment about a potential witness's absence is not reversible error in and of itself. *Brock v. State*, 530 So.2d 146, 154-155. In *Brock*, the Court noted that a jury is more likely prejudiced where the evidence is close. *Id.* (citing *Collins v. State*, 408 So.2d 1376, 1380 (Miss. 1982)). Conversely, this Court has reversed cases on this ground alone where the prosecuting attorney remarked that the defendant did not call a particular witness. *See, e.g., Holmes [v. State,]* 537 So.2d 882, 884-85; *Madlock v. State*, 440 So.2d 315, 317-18 (Miss. 1983); *Morgan v. State*, 388 So.2d 495, 497-98 (Miss. 1980). Additionally, where comments by the prosecuting attorney were coupled with other errors, this Court reversed decisions holding the accused was denied a fair trial. *See Collins v. State*, 408 So.2d at 1379-80; *Griffin v. State* 533 So.2d at 449.

*Burke*, 576 So.2d at 1241.

¶60. In the present case, the State not only commented about the absence of one potential witness, it commented on the absence of 24. The point which compounds the error is that the remark regarding the 24

witnesses who did not testify on behalf of Randall followed Randall's objection to the State's improper comment regarding the absence of one witness. His objection was apparently sustained. This error is anything but harmless. This, by itself, approached the edge of reversible error. We caution prosecutors in future to refrain from this line of argument and specifically caution the State to refrain from repeating this error on remand.

### B. Whether the Prosecution Impermissibly Shifted the Burden to the Defendant In Closing Argument

¶61. Randall's next assignment of error alleges that the State's remarks during closing arguments improperly shifted the burden of proof unto him. He reminds us of *Smith v. State*, 754 So.2d 1159 (Miss. 2000) where we repeated what is by now, certainly no stranger to our law: "The burden of proof in a criminal case never shifts from the State to the defendant." *Id.* at 1164.

¶62. Randall complains of the following language: "Where is the evidence? What evidence do you have of that? You can't guess or speculate. *Something has to be given to you*." (emphasis added.) Randall additionally directs our attention to the following subsequent comment by the State: "[t]here is no evidence or exhibit that some other person did this." According to Randall, these comments only served to confuse the jury by creating an inference that he shouldered the burden of proof at trial. Randall further asserts that instead of noting that the jury had been properly instructed, that the trial judge should have issued a curative instruction.

¶63. The State relies on *Holland v. State*, 705 So.2d 307 (Miss. 1997) which states that "it is imperative that the statements be read in their appropriate context in light of that which the prosecutor was in fact arguing to the jury at the time." *Id.* at 347. When the State's arguments are read in context, this assignment of error is without merit.

¶64. As to the first language Randall now complains of, after he objected to the State's remarks, the following occurred:

> THE COURT: The jury has been properly instructed that the burden is upon the State of Mississippi to prove guilt beyond a reasonable doubt. Let's move on, Mr. Simpson.

> MR. [PROSECUTOR] SIMPSON: You must be convinced beyond a reasonable doubt that the defendant and these others did rob and shoot and kill him. All the evidence that you have before you supports that, demands that. *There is no evidence or exhibit that some other person did this*.

(emphasis added). Thus, even after the trial judge instructed the State to "move on," it persisted in presenting its argument in a way that attempted to shift the burden of proof to Randall.

¶65. When this entire line of argument is read in context, the State's comments did create an inference that Randall possessed the burden of producing evidence to prove or establish his innocence or the burden to refute the State's case. Although the State attempts to defend its arguments by claiming that it was merely commenting on the weight of the evidence, we disagree. The State's arguments were "loaded" in that proper comments were intertwined with improper ones, thus making it improbable that the jury would be able to distinguish among them. The above-quoted portion is one example.

¶66. While the State may properly comment on facts in evidence, the truth of the matter before us is that the

jury could reject Randall's version of events *and* still find that the State did not prove each and every element beyond a reasonable doubt. The jury's choice was not an "either, or." Randall had no burden to prove that the two unidentified men were the actual killers, and Randall had no burden to create reasonable doubt. The State's closing argument repeatedly emphasized not guessing and the importance of the evidence, but this was consistently in relation to Randall's theory of the case. To suggest that Randall had the burden of proving or establishing anything was error.

## C. Whether the Prosecution Improperly Referred to Matters Outside the Record

¶67. Randall next asserts that the State improperly commented on matters outside of the evidence. "Arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error." *Dancer v. State*, 721 So.2d 583, 589 (Miss. 1998)(citing *Tubb v. State*, 217 Miss. 741, 744, 64 So.2d 911 (Miss. 1953)). Although error, the question of whether the comment constitutes reversible error is a separate and distinct question. The test in this state for determining whether comments such as these require reversal "is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Id.* at 590.

¶68. As a preliminary matter, the State asserts that Randall is procedurally barred from raising this issue now because his objection at trial was that Brinkley was only a potential witness and Randall had not called him. We agree. The State reminds us of our decision in *Doss v. State*, 709 So.2d 369 (Miss. 1996) where we said that "an objection on one or more specific grounds constitutes a waiver of all other grounds." *Id.* at 378 (citing *Conner v. State*, 632 So.2d 1239, 1255 (Miss. 1993)). We agree.

¶69. The State asserts that there is yet another reason that Randall is barred from raising this issue before us: Randall failed to request a curative instruction or a mistrial. We agree with this as well. In *Walker v. State*, 671 So.2d 581 (Miss. 1995), the prosecutor made improper comments before the jury regarding why certain stipulations had been made. When defense counsel objected, the judge told the prosecutor not to say anything else about the reasoning behind the stipulations. We relied on our decision in *Foster v. State*, 639 So.2d 1263 (Miss. 1994) and quoted the following to reject defendant's assignment of error:

> Foster neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris' unresponsive remark was effectively cured when the trial judge sustained Foster's objection.

*Walker*, 671 So.2d at 616.

¶70. The procedural bar notwithstanding, Randall takes issue with the State's assertion that Randall did not call France Brinkley because "Brinkley, all of a sudden, didn't have gunshot residue on his hands." Randall asserts that the State's crime scene expert did not even test Brinkley for gunpowder residue. The State "submits that the comment was consistent with the evidence." A review of the record reveals that there was no evidence before the jury that France Brinkley was tested for gunpowder residue and that the test results were negative. In fact, when the State's expert was asked if he had tested Brinkley for the presence of gunpowder, he answered: "I never - - I don't recall seeing him until - - I don't believe - - I don't know if he was there or not when I got there." The absence of gunpowder residue on Brinkley was not in evidence. Thus, it was error for the State to make this assertion.

¶71. Randall argues that our decision in **Holmes v. State**, 537 So.2d 882 (Miss. 1988), requires a reversal in this case. In **Holmes**, the prosecution made an improper comment on the failure of a witness to testify. The State in **Holmes**, just as the State does now, tried to argue that any alleged error from the comment was subsequently cured by the instructions to the jury. We rejected this argument and said: "We cannot visualize any real curing effect the court's instruction *prior to oral arguments* may have had upon this unfortunate comment by the prosecutor *in closing argument* upon the defense's failure to call [his] "good friend" Mason." *Id.* at 885 (emphasis in original). In the case at bar, the jury was instructed prior to oral arguments. This comment by the State occurred during closing arguments. Thus, Randall concludes a reversal is warranted.

¶72. The State asserts that the jury instructions cured any alleged error, and urges that **Burns v. State**, 729 So.2d 203 (Miss. 1998) abrogates Randall's assertion of error. We agree. Randall's jury was instructed that "[a]rguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence." The jury was further instructed that "if [the attorney's] recollection of the evidence differs from what your recollection is, you must follow your own recollection." The State further refers to our decision in **Burns v. State**, 729 So.2d 203 (Miss. 1998) where we said that "when a jury is properly instructed that statements made by counsel are not in evidence, reversal is not required." *Id.* at 229 (citing **Ormond v. State**, 599 So.2d 951, 961 (Miss. 1992)). We are to assume that the jury followed the trial court's instructions. **Williams v. State**, 684 So.2d 1179, 1209 (Miss. 1996)(citing **Johnson v. State**, 475 So.2d 1136, 1141 (Miss. 1985)).

¶73. Randall's jury was properly instructed before closing arguments began. The jury was additionally told before closing arguments began that they would not be allowed to continue taking notes because "[t]he reason is clear, that is not evidence. That is not testimony." Although Randall did not request a curative instruction, his objection was sustained for all practical purposes, and the trial court instructed the prosecutor to "move on." Additionally, this improper comment by the State was isolated in occurrence. Consequently, this isolated comment by the prosecution did not create an unjust prejudice against Randall so as to result in a decision influenced by the prejudice so created. For the foregoing reasons, this issue is procedurally barred, and alternatively, without merit.

¶74. However, we agree with Randall's first two assignments of error. Each of them individually bordered on the edge of reversible error. When these errors are combined, their cumulative error requires reversal.

### IV. WHETHER THE COURT COMMITTED REVERSIBLE ERROR BY DENYING DEFENDANT'S MOTIONS FOR A DIRECTED VERDICT AND A NEW TRIAL

¶75. Randall next asserts the trial judge committed reversible error by denying both his motion for a directed verdict which was made a the close of the State's case, and his motion for a JNOV which was made after the verdict was rendered. Randall also asserts the trial judge erred by refusing a peremptory jury instruction which would have instructed the jury to find Randall "not guilty."

¶76. After a thorough review of the record, we find that this assignment of error is without merit.

### V. WHETHER THE STATE'S FAILURE TO COMMENCE MR. RANDALL'S TRIAL UNTIL FIVE YEARS AFTER THE ALLEGED CRIME DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.

¶77. Randall's next assignment of error asserts that his Fifth Amendment right to due process was violated because the State intentionally delayed his indictment for three years after Daniels's death. Specifically, Randall asserts that the State intentionally delayed the indictment for this case until Randall was convicted of a separate and unrelated capital murder in order to use the prior conviction as an aggravating factor to secure a death sentence in this case. Randall further asserts that this delay caused him to lose the exculpatory testimony of Liberty Van Court. We find no merit in this assignment of error.

¶78. Randall alleges that the State new for nearly three years that he had been identified by jailhouse informants as being involved in Daniels's murder before it sought his indictment. This jailhouse informant's name is Chris Payne, one of Randall's co-defendants in the first capital murder trial. Randall presented this argument to the trial court in a post-trial motion. The trial court rejected this argument and ruled as follows:

> Based upon the court's review of the investigative reports, it does not appear that Mr. Randall even became a suspect in this case until late September, 1996. When Sgt. Warren Newman of the Biloxi Police Department interviewed an individual at the Harrison County jail. That is the earliest I see that Mr. Randall as being a suspect. And then the case would normally have to be investigated once names are received. And only three or four months transpired between September of 1996 and the DA's office receiving the rather, I'm sure, voluminous file on April 7, 1997. And when I saw voluminous, I am sure it is, because there were five defendants in the capital murder case.

> Within a month, the case was presented to the Grand Jury. Indictment returned in the same month, May of '97. Scheduling orders by agreement were entered. Mr. Crosby was regained June, '97. Arraignment September, '97, followed by additional agreed continuances through agreed scheduling orders in December and May of '98.

> Motions in September '98 and trial in November of '98.

> ***

> So the court finds nothing to indicate the state has made any deliberate attempt to delay the trial in this case. And at worst, the court would find all of that time as being neutral, not to be held against either side.

> ***

> As to the defendant's challenge of prejudice, this court finds that without merit. Your motion to dismiss for lack of speedy trial is noted on the record. It is overruled.

Randall's motions asserted both a Fifth Amendment due process violation as well as a Sixth Amendment speedy trial violation. However, in this Court, he only assigns his error to the Fifth Amendment due process claim.

¶79. The State reminds us of the standard of review for Randall's Fifth Amendment claim:

> That protection is limited. The passage of a long period of time between knowledge by the prosecution of indictable conduct and an indictment is not enough. Even if the delay was harmful to a defendant. Rather, defendants must show that the government intentionally delayed an indictment to gain a tactical advantage, and that the delay caused them actual and substantial prejudice.

*United States v. Carlock*, 806 F.2d 535, 549 (5ᵗʰ Cir. 1986).

¶80. Randall asserts that "the State could have, and should have, investigated Chris Payne's statement implicating Mr. Randall in 1994. The State's delay in choosing to wait almost two years after receiving concrete information regarding Mr. Randall's alleged involvement in the Daniels case before prosecuting Mr. Randall exponentially increased the likelihood that a jury would impose a death sentence in this case." However, the United States Supreme Court has already said that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free in defining 'due process' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.'" *United States v. Lovasco*, 431 U.S. 783, 97 S. Ct. 2044, 2049, 52 L. Ed. 2d 752 (1977).

¶81. We agree with the finding of the trial judge that there are no indicia of any deliberate attempt of delay by the State. As the United States Supreme Court so simply put it:

> It requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer from seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'

*Lovasco*, 97 S. Ct. at 790-91. Randall has not demonstrated any intentional delay to the indictment on the part of the government.

¶82. Randall has additionally failed to prove that any alleged delay caused him actual and substantial prejudice. As the State reminds us, the prejudice that Randall is required to show "is some impairment of his ability to defendant against the government's charges, not hardship accompanying his prosecution." *United States v. Wehling*, 676 F.2d 1053, 1059 (5ᵗʰ Cir. 1982) (citing *United States v. Marion*, 404 U.S. 307, 320-23, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)). Although Randall seeks somehow to attribute Van Court's unavailability to the alleged intentional delay by the State, there is nothing in the record to indicate that she would have been available at any time in the three years proceeding his trial. Consequently, this assignment of error is without merit.

## VI. WHETHER RANDALL HAS BEEN DENIED HIS RIGHT TO A MEANINGFUL APPEAL.

¶83. Randall asserts that the record before us is not complete, and consequently, he has been denied his right to a meaningful appeal. Before trial began, Randall moved the trial court to require everything to be on the record. This motion was granted. Randall now complains of unrecorded bench conferences and the fact that the trial judge's reading of the jury instructions was not recorded. He further complains that the contents of a tape of a witness's statement which was played to the jury during the sentencing phase was not recorded. Randall made a motion in this Court, pursuant to Rules 10(c) and 10(f) of the M.R.A.P. for an order to remand the case back to the Circuit Court of Harrison County with directions to supplement the record. We granted this motion on April 19, 2000, to determine whether the record should be supplemented. The circuit court held a hearing on May 8, 2000, to determine whether the record could be

supplemented. The trial judge ruled that the supplementation was not necessary. Randall asserts that this ruling was in error. In support of this argument, Randall directs our attention to that part of *Davis v. State*, 684 So.2d 643 (Miss. 1996) which states "the law obligates the court reporter to take notes of all proceedings at trial so they will be available in the event of an appeal." *Id.* at 651.

¶84. We have had occasion to address an argument similar to the case at bar in *Burns v. State*, 729 So.2d 203 (Miss. 1998). In *Burns*, the appellant also filed a pretrial motion requesting all hearings be recorded. Burns' motion was granted. Burns argued before us that because the entire proceedings were not contained in the record, he had been denied his right to a meaningful appeal. Burns, just as Randall does now, referred to *Davis*. Burns referred to that portion of *Davis* which stated that the trial courts should "ensure that every word is transcribed stating, '[W]e direct without equivocation that court reports should never fail to preserve for record at-the-bench or chambers conferences following objections . . . the trial judge is responsible to enforce this directive.'" *Burns*, 729 So.2d at 212 (citing *Davis v. State*, 684 So.2d at 651). In *Burns*, we went on to note that "*Davis* also states, '[h]owever, it is the appellant's burden to furnish the record.'" *Id.*

¶85. Additionally, in *Burns*, we relied on one of our previous decisions in which we said:

> While defense counsel filed a motion June 23, 1987, to require the transcription of all proceedings at the bench outside the present of the jury, the record shows that counsel participated in unrecorded conferences without calling it to the court's attention, or making any contemporaneous requests at the time to have comments made a part of the record. It is in poor grace for counsel to participate without objection in unrecorded bench conferences and complain for the first time on appeal. We find no error here.

*Id.* (citing *Thorson v. State*, 653 So.2d 876, 895 (Miss. 1994) (citing *Doby v. State*, 557 So.2d 533, 536 (Miss. 1990)). *See also*, *Watts v. State*, 717 So.2d 314 (Miss. 1998); *Davis v. State*, 684 So.2d 643 (Miss. 1996).

¶86. The trial judge did hold a hearing to determine if the record should be supplemented pursuant to an order from this Court. The ultimate conclusion of the trial judge was that "the court is very comfortable with the statement that no procedural matters were held that were not later placed on the record." Randall complains of the absence of the following three specific items from the record: (1) certain unrecorded bench conferences; (2) the trial judge's reading of the jury instructions; and (3) the contents of the tape of a witness's statement. Yet, Randall has failed to show how this caused any prejudice to this appeal. In regard to the unrecorded bench conferences, Randall states only that they "could be important to demonstrate the objections that the parties interposed and the rulings of the court below were not recorded." It is true, as the State asserts, that the written jury instructions are in the clerk's papers which are a part of this record. Additionally, there is a transcription of the tape recorded statement in the record before this court. Randall made no contemporaneous objections at trial to the failure to transcribe any portion of the proceedings. Although Randall now objects to the absence of the trial court's reading of the jury instructions as a part of record, he made no such objection at trial. Because Randall made no objection to the bench conferences and jury instruction reading not being included as a part of the record, and because he participated in them without objection, this assertion of error is without merit.

### VII. WHETHER THE ERRORS TAKEN TOGETHER ARE A CAUSE FOR REVERSAL OF RANDALL'S CONVICTION FOR CAPITAL MURDER.

¶87. For the foregoing reasons we agree with Randall that the cumulative effect of the errors in the trial court denied him the right to a fair trial. When all errors are taken together, the combined prejudicial effect requires reversal. *See Williams v. State*, 445 So.2d 798, 810 (Miss. 1984).

## PART TWO

## (SENTENCING PHASE)

### I. WHETHER THE TRIAL COURT FAILED TO EXCLUDE EVIDENCE OF GANG MEMBERSHIP FROM THE PEN PACK, WHICH CONSTITUTES CONSTITUTIONAL ERROR REQUIRING THAT THE DEATH SENTENCE BE VACATED.

¶88. Counsel for Randall timely objected to the introduction of Randall's penitentiary package or "pen pack" into the jury room to assist them in determining whether to sentence him to death. Specifically, Randall asserts that any information regarding Randall's gang symbol tattoos and any alleged membership in the black gangster disciples should have been expunged from the "pen pack" before it was submitted to the jury. Randall asserts that any gang affiliation was irrelevant to prove the existence of any statutory aggravating factors. The trial judge ruled over defense objection that the "pen pack" was admissible during the sentencing phase in toto.

¶89. There are various components of the "pen pack," but the one at issue here is Randall's social admission form. In the place where the form requests "MARKS, SCARS & TATTOOS" Randall's form reads as follows: "TTO: 6 PT STAR & DAGGER 'BUL' R-arm; '$' L-arm; 'G' chest; 'DOG' pitchfork l-hand/other; 2-holes L-ear." There is another heading entitled "GROUP AFFILIATIONS" and there is another listing for "STREET GANGS." Randall's form includes "Black Gangster Disciples." Randall asserts that this information was irrelevant and that the harm and prejudice were magnified because the jury was allowed to take the "pen pack" into the jury room during their deliberations. Randall correctly states our rule of law that the State may only introduce evidence that is relevant and necessary to establish the existence of aggravating factors. *See Walker v. State*, 740 So.2d 873, 886 (Miss. 1999). The two statutory aggravators relevant here are (1) pursuant to Miss. Code Ann. § 99-19-101(5) (2000): that Randall was previously convicted of "another capital offense or a felony involving the use of threat or violence to the person," and (2) pursuant to Miss. Code Ann. § 99-19-101(5)(b) that the murder of Eugene Daniels was committed in the course of a robbery.

¶90. The State offers several lines of defense. First, the State asserts that "it is uncertain from this record how the jury could have made any gang association from the cryptic, almost illegible, hand-written notes on Randall's tattoos." However, as Randall notes, if the State was able to decipher this information, so too was the jury. The State next asserts that because some of the witnesses referred to Randall as Bull, that the fact he has a "BUL" tattoo is somehow relevant. There was no proof in the record that the nickname was gang related, therefore this assertion too is without merit. The State additionally asserts that those portions of the "pen pack" were not emphasized or mentioned by the prosecution in any way.

¶91. The State further alleges that the only testimony regarding any gang related activity was introduced by the defendant. The State directs our attention to the testimony of Chris Fair during his direct examination at the sentencing phase of the trial. Fair had written a letter to a police officer claiming that he was afraid because he had cooperated with authorities. That portion of the letter which the State now highlights reads

as follows: ". . . they shooting letters and crosses like it ain't nothing, and I know for a fact my life is in danger in the Harrison County jail from G's to VL's all over this zone." We agree with Randall on this point as well, in that Fair was expressing his fear that he was in danger in prison, and makes no mention of anyone being a member of any gang.

¶92. Although the trial court and the State seem to be operating under the assumption that this Court has rendered a decision declaring "pen packs" to be admissible in toto, we know of no such case, and our research has revealed none. The State, however, cites to *Russell v. State*, 670 So.2d 816 (Miss. 1995) to support this allegation. However, *Russell* can be distinguished on its facts. The appellant in *Russell* complained of the introduction of his "pen pack" because of the details contained regarding his prior convictions. His grievance was that the "pen pack" "contained information far beyond the mere existence of each of the prior convictions." *Id.* at 829. We held that those "pen packs" were *relevant* to prove beyond a reasonable doubt the two statutory aggravators. *Id.* at 831 (emphasis added). We did not hold that "pen packs" will be admissible in toto during the sentencing phase of a trial.

¶93. Therefore, the true inquiry is a simple issue of relevance. This evidence was clearly irrelevant in the determination of whether Randall had committed another capital offense or felony involving the use or threat of violence to the person. There was no allegation nor was there any proof that the robbery and the murder were in any way gang related. It is further irrelevant as to whether the murder of Eugene Daniels was committed in the course of a robbery. Again, there was no argument nor proof that the robbery was in any way gang related. Therefore, any evidence of gang membership or affiliation was simply not relevant to establish either of the statutory aggravators at issue here.

¶94. Randall directs our attention to the United States Supreme Court's decision of *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) and this Court's decision in *Walker v. State*, 740 So.2d 873 (Miss. 1999). However, both cases are factually distinguishable from the case at bar. In *Dawson*, the defendant was convicted of first degree murder. He entered into a stipulation which provided:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. The separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons, including Delaware.

*Dawson*, 503 U.S. at 162, 112 S. Ct. at 1096.

¶95. The defendant entered into this stipulation in exchange for the State's agreement not to call an expert witnesses to testify about the Aryan Brotherhood. *Id.* The United States Supreme Court flatly rejected a per se ban of the admission of evidence concerning one's belief and associations at a sentencing simply because those beliefs and associations are protected by the First Amendment. *Id.* at 165, 1097. The Court said "because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Id.* at 116, 1098. The Court went on to say that there may be instances when such association is relevant. They gave as an example proof that a defendant's membership in an organization that endorses the killing of any identifiable group might be relevant to a jury's determination into whether a defendant will be dangerous in the future. *Id.* The problem with the evidence was that it never showed specifically how the defendant's affiliation in any way contributed to any of the aggravating circumstances. The Court was offended that the stipulation only established the defendant's abstract beliefs. *Id.* Importantly, the Court specifically declined to address the issue of whether this error

was harmless.

¶96. In our decision in *Walker*, the defendant was questioned excessively about gang signs and threats during the guilt phase of his trial. However, there was not any testimony offered to show that he actually was a member of a gang until the sentencing phase of his trial. The State never did produced any evidence to support its claim regarding gang affiliation. Therefore, we conducted a review pursuant to Miss. Code Ann. § 99-19-105 (3)(c) (Supp. 1998). We considered whether his death sentence was based upon an arbitrary factor. We relied on our oft stated rule that during the sentencing phase of a death penalty case, the State is limited to offering evidence that is relevant to one of the aggravating circumstances included in Miss. Code Ann. § 99-19-101. *Id.* at 885 (citing *Jackson v. State*, 672 So.2d 485, 487 (Miss. 1986)). We held that the testimony injected an impermissible factor into the sentencing process and we remanded the case for a new sentencing hearing.

¶97. Although the *Walker* facts are distinguishable this issue also implicates Miss. Code Ann. § 99-19-105 (3)(a) which states that with regard to the death sentence, this Court shall determine "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Although Randall makes no reference to this statute, he apparently argues its terms. He states: "[T]his Court can't imagine the jury's impressions as it repeatedly perused through the pen pack's vivid descriptions of Mr. Randall's gang symbol tattoos indicating that Mr. Randall has a 6-point star and dagger, the word "BUL" and a dollar sign tattooed on his arm, the letter "G" on his chest, and the word "DOG" with a pitchfork tattooed on his left hand. As if gang symbols alone were not prejudicial enough, the jurors were also able to read the words 'black gangster disciples' over and over again under the caption of 'GROUP AFFILIATION' in the social admission interview contained in the pen pack."

¶98. The State argues that the error, if any, was harmless. However, the record shows, as Randall argues, that the prosecutor did focus the jury's attention on the pen pack by employing the jury to "[g]o to the pages of this document [i.e., the pen pack] and look at his record. Look at how he has conducted his behavior over the years." Since the jury was allowed to take this evidence into the jury room, these prejudice was accentuated. Standing alone, any alleged gang membership or affiliation is not relevant. This is not to say that it might not become so for rebuttal purposes depending on circumstances in the next trial. Consequently, unless a proper foundation is laid in the next trial which would make gang membership relevant, this information has no reason to be before the jury.

### II. WHETHER THE PROSECUTORIAL MISCONDUCT DURING THE SENTENCING PHASE OF RANDALL'S CAPITAL MURDER TRIAL REQUIRES THAT THE DEATH SENTENCE BE VACATED

¶99. Randall next asserts that the prosecution engaged in misconduct which requires his death sentence now be vacated. He alleges that the prosecution's misconduct violated his constitutional right to a fair trial under the Sixth and Fourteenth Amendments of the United States Constitution and under Article 3, §§ 14 and 26 of the Mississippi Constitution.

### A. Whether the Prosecution Improperly Minimized and Misrepresented the Jury's Role and Level of Discretion in Determining Whether Randall Should be Sentenced to Death

¶100. Randall first asserts as error the prosecution's statement to the jury that they only had a "small role" in determining whether Randall should receive the death sentence. Randall additionally alleges that the

prosecution improperly and falsely instructed the jury by telling them that they must sentence Randall to death if they found that the aggravating circumstances outweighed the mitigating factors by any degree. The following is the language of which Randall complains:

> You are required to follow the law. Under the oath you are required to deliberate and properly consider the law as it relates to the facts. *Nobody is going to kill Mr. Randall today*. What we are requesting on behalf of the State of Mississippi is that you impose what the state Legislature has allowed and demands in a case of this nature. *When and if Mr. Randall receives the death penalty, you are not killing him. You are not physically involved in that process. Your decision plays a role, but only a small role*.

(emphasis added).¶101. The State argues that because Randall made no contemporaneous objection, he has waived this issue for appeal. The State refers us to our decisions in ***Evans v. State***, 725 So.2d 613, 670 (Miss. 1997) and ***Davis v. State***, 660 So.2d 1228, 1255 (Miss. 1995) to support its claim. However, "we have long held unwarranted and improper remarks of a district attorney would warrant reversal where there was 'most extreme and intolerable abuse of his privilege,' even without defendant attorney's objection." ***Williams v. State***, 445 So.2d 798 (Miss. 1984). This rule is applicable here and we may properly address this issue on its merits notwithstanding the lack of a contemporaneous objection.

¶102. In ***Williams***, we were confronted with a different prosecutorial comment. The prosecutor in ***Williams*** commented on the "eight automatic stages of appeal" that the defendant would have the opportunity to pursue. We addressed the assignment of error notwithstanding the lack of contemporaneous objection. Although, the subject of the comments was different than that in the case presently before us, the fundamental principles annunciated are equally applicable here.

¶103. We condemned closing arguments by the prosecution which attempt to lighten the burden on the jury when passing upon a life or death issue. We said:

> The argument made by the prosecuting attorney to the jury that their verdict was not "last word" was clearly erroneous and would ordinarily be considered highly prejudicial. . . in a death penalty case a jury should never be given false comfort that any decision they make will, or can be, corrected.

***Id.*** at 811 (citing ***Hill v. State***, 432 So.2d 427 (Miss. 1983)). It is significant for our purposes here that we also said: *"Therefore, we emphasize that the jury's verdict at the sentencing phase is the single most important stage of the process of determining whether the defendant will live or die."****Id.*** (emphasis added).

¶104. The State in ***Williams*** requested that we set forth the proper subject for argument. Although we found that we have the authority to provide a definitive answer, we declined to do so. Although we did not make any hard and fast rule, we did offer valuable guidance:

> The structure of the capital sentencing system enacted by our Legislature places the entire sentencing burden on the jury. No judge or other official within our system has the power to impose the sentence of death; only the jury. Therefore, if under our system the capital sentencing jurors are allowed to consider or speculate that any death verdict they may return may later be vacated on appellate review can only have the effect of lessening the sense of responsibility our law has devolved upon them.

> Sentencing a citizen to death is the responsibility vested by law in our juries. *Any matter presented*

*to such jurors which would allow them to shift their awesome responsibility to others is simply contrary to our law. . . We hold, therefore, that no argument may be made to the jury regarding appellate review or any other matter which might reasonably be expected to cause a juror to consider that he or she shares with anyone other than his or her eleven fellow jurors that responsibility of determining whether the defendant will be sentenced to death.*

*Id.* at 811-12 (emphasis added).

¶105. Our decision in *Wiley v. State*, 449 So.2d 756 (Miss. 1984), was handed down within the same month as *Williams*. In *Wiley*, we reiterated our rule that when a prosecutor's argument informs the jury that their verdict is subject to a right of appeal, such argument constitutes reversible error. *Id.* at 762. We then emphasized, that "the rationale of the *Howell* [*v. State*, 411 So.2d 772 (Miss. 1982)] decision is designed to secure the individual juror's sense of responsibility for the fate of the accused." *Id.* We also stated that any prosecutor making, what we termed, a "last word" argument is "asking for a mistrial." *Id.* The fundamental principle underlying our statements is that:

Under our law the jury is the sole player in the judicial process who may vote to send an accused to die. They alone make that determination and all review is then conducted with a presumption of its correctness. While a jury is not literally "the hangman," only they may supply the hangman's victims. *All notions of justice require that the jurors as individuals, and as a body, recognize and appreciate the gravity of their role.*

*Id.* (emphasis added). *See also Williams v. State*, 544 So.2d 782 (Miss. 1987).

¶106. The State believes that arguments by the defense somehow opened the door for its arguments regarding the "small role" of the jury by the following statements of defense counsel:

Will you kill Armon Randall? You sit here and it is easy to write - - to use a pen. It is easy to fill out a piece of paper. It is very simple. And then it gets filed, it moves on, they take him, he is on death row, they have the paper, it is done. Just like a commander that says fire, just as effective as the person who pulls the trigger as it is the person who gives a command to do so.

You will make the decision one way or the other.

***

Now, that all goes to residual doubt. That all goes to whether or not you can find - - whether or not you are going to ignore all that and find that you could kill somebody, where you have to make that decision now to kill Armon.

***

One day you are going to ask yourselves if you made the right decision and you have got to take that into consideration now more than ever, because for the first time, this is truly a life and death decision. It is not a figure of speech.

***

Will it be death? Will it be the end of Armon Randall? Will it be the end of a human being? Is it a time

to kill, or will it be life?

¶107. We have already rejected an opening the door argument regarding prosecutorial arguments which use appellate review to minimize the responsibility of the jury in *Williams*, 445 So.2d at 812. "The defendant does not 'invite' comment on appellate review by reminding the jury that it is the legally constituted authority for deciding whether the defendant will live or die. . . Both prosecutors and defense counsel in final argument to the jury at the sentencing phase should focus on the decision the jury is charged by law with making whether the defendant will live or die." *Id.*

¶108. The State refers to *Ballenger v. State*, 667 So.2d 1242 (Miss. 1995) where we stated that "an exception exists where the objectionable statement was invited or responsive to the statement of the defense counsel and has been recognized by the United States Supreme Court in *Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L.Ed.2d 144 (1986) and *United States v. Young*, [470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)]". However, Randall did not open the door. He did emphasize the gravity and importance of the jury's decision. He explained that: "You will make that decision one way or the other. You will decide death, you will decide life without parole - without the hope of parole, that is." As the preceding discussion makes clear, the jury does have a vital, crucial, and incredibly important role in the sentencing process. As we advised in *Williams*, the prosecution and defense should focus on the decision the jury will make, the decision between life and death. This is exactly what counsel for Randall did. Randall's comments needed no rebuttal, and this argument by the State is without merit.

¶109. Randall tells us that this was not the only instance of prosecutorial misconduct. He also complains of the following arguments:

> But once you find aggravating circumstances, the State does not have to shift the boulder from one side to the other. *If the aggravating circumstances outweigh the mitigating circumstances ever so slightly, then upon the law you are to impose the sentence of death.*
>
> ***
>
> In this case you have benefit of those aggravating circumstances, be4ing these convictions, another capital murder conviction. Your responsibility in this case is pretty straight forward. The aggravating factors far outweigh the mitigating factors and it is only the slightest tip. Your decision is very difficult. The facts are not. *However, when we ask you the questions during voir dire, you agreed that if the facts and the law demanded a death verdict, you could do it. So on behalf of the State of Mississippi, we believe that the facts and the law demand a death verdict against Mr. Randall,* and we request you do so.

(emphasis added).

¶110. Randall asserts that the prosecution's argument "divest[ed] the jury of its 'portentous duty of deciding an accused's fate.'" *Wiley v. State*, 449 So.2d 759, 762 (Miss. 1984). He reminds us that our law does not require a jury to sentence a defendant to death under any circumstances by quoting the following language from *Leatherwood v. State*, 435 So.2d 645, 650 (Miss. 1983)):

> Under our capital murder statute, when an accused is found guilty of capital murder arising out of robbery, he then becomes subject to a jury finding that he should be executed if the jury feels that the facts justify it. However, *his execution is not mandated* and the jury may properly find that he

should be sentenced to life in prison. *They may so find whether the defendant puts on evidence of mitigating circumstances or not*.

(emphasis added).

¶111. When the State's argument is read in isolation, it appears Randall's assertion is correct. However, once this is read in context, we are inclined to agree with the State, that the State was only commenting on the weight and sufficiency of the evidence. Immediately following the language of which Randall now complains, the State said:

> It is not a counting process. You will be instructed. It is a weighing process. *You weigh the credibility and the weight, the severity, the impact of the testimony, the mitigating versus the aggravating*. When you do that, then you consider the potential sentences that *may be* imposed.
>
> ***
>
> The State of Mississippi brought this case and asks you now to consider and weigh the aggravating versus the mitigating. *And we believe at the conclusion of that evidence the aggravating circumstances will, in fact, over weigh the mitigating circumstances*, and on your oaths and under the law as it permits in this state, the proper sentence will be the imposition of death.

(emphasis added).

¶112. However, this is not an assertion that this Court takes lightly, and we caution the State to proceed with caution in the next trial.

### B. Whether the Prosecutor Improperly Argued Victim Impact for the Victim of a Different Murder

¶113. Randall next complains that the prosecution improperly argued victim impact regarding his previous capital murder conviction. We agree. In its closing arguments during the sentencing phase, the prosecution said:

> MR. WARD: . . .*I wish that we had some choices today. Miss. Le is dead.*[3] Mr. Daniels is dead. *We don't have that choice*. If we could go back and turn back everything that Mr. Randall has done, Lord knows we would be doing that today. I don't want Mr. Randall to go to the penitentiary. *I want these people back, just like the families do, but we can [sic] do that*.
>
> MR. CROSBY: Objection for the argument for sympathy when he is told not to.
>
> THE COURT: Overruled.
>
> ***
>
> MR. WARD: The families of the first murder - - the second capital murder victim, whose trial was first, had some responsibilities. *They came and they sat in trial and they waited and they hoped for justice, and a verdict of life without parole was rendered in that case*.
>
> MR. CROSBY: Objection, you Honor, improper argument.

T HE COURT: Move on.

MR. WARD: They did not have the benefit - -

MR. CROSBY: Objection to improper argument.

THE COURT: Let's move on.

MR. WARD: - as in this case -

MR. CROSBY: Objection, your Honor. He is continuing with his argument. You told him to move on.

THE COURT: He is going to move on.

MR. WARD: In this case you have the benefit of those aggravating circumstances, being these convictions, another capital murder conviction. Your responsibility in this case is pretty straight forward. . .

(emphasis added).

¶114. The State asserts, as it did in part "A," that this argument is procedurally barred because Randall did not ask the trial judge to admonish the jury to disregard these comments or request a mistrial. However, as in part "A," we may still properly address this issue on its merits under *Williams v. State*, 445 So.2d 798 (Miss. 1984) where we said: "we have long held unwarranted and improper remarks of a district attorney would warrant reversal where there was 'most extreme and intolerable abuse of his privilege,' even without defendant attorney's objection." Due to the continued and insistent nature of the State's conduct, even after being instructed to "move on," the spirit of the rule announced in *Williams* has been satisfied here.

¶115. Randall likens his situation to the one in *Stringer v. State*, 500 So.2d 928 (Miss. 1986). In *Stringer*, the prosecutor introduced pictures of a victim from a murder separate from the one for which he was on trial. The prosecutor also showed the jury a slide-show of these pictures during the closing arguments for both the guilt and sentencing phases. During the sentencing phase, the prosecutor "reminded the jury that Stringer did not receive the death penalty in his trial for the murder of [the other victim], and emphasized that: [T]his is my last chance. This is the state of Mississippi's last chance. This is the relatives of [the other victim's] last chance for retribution." *Id.* at 935. We began our discussion by saying that the pictures were not overly gruesome, and that "[t]he question in this case is primarily one of relevance." *Id.* at 934. We noted that the prosecutor had introduced the photographs to get a "second bite at the apple." *Id.* at 935. We said: "Just as a lack of evidence taints [the sentencing phase], so does the admission of irrelevant or inflammatory evidence." *Id.*

¶116. Randall also refers to *Mack v. State*, 650 So.2d 1289 (Miss. 1994), where we were confronted with an allegation of improper elicitation of personal characteristics of a victim and that victim's family. We said that this evidence "as is relevant to *the crime charged* is admissible, notwithstanding an objection that it bears on the victim's character." *Id.* at 1324 (citing *Hansen v. State*, 592 So.2d 114, 146 (Miss. 1991)).

¶117. The State claims it was responding to defense counsel's repeated arguments of residual doubt. The State refers to the following arguments:

You don't have a situation where someone has got a conviction, went out and disregarded the law and did anything. This conviction on the basis of the same mess that you heard in this trial happened - - the events happened before the charge that you presided over.

We disagree. The State's insinuation to the jury that justice was not served for Le's family because Randall only received a sentence of life without parole, in no way establishes that Randall did, in fact, commit the other murder.

¶118. The State also claims that it was entitled to discuss the circumstances of the prior convictions in order to prove the aggravating circumstance that Randall was previously convicted of another capital offense or of a felony involving the use or threat of violence to a person. We disagree. The State's appeals to the jury to impose the death penalty in retribution for Le's family were improper. The State introduced Randall's pen pack. The pen pack was the evidence for his prior capital murder conviction. Retribution on behalf of Le's family served no purpose save to inflame and prejudice the jury.

> ### III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTION TO PRESENT THE UNDERLYING DETAILS OF RANDALL'S PRIOR FELONY CONVICTIONS WHERE SUCH EVIDENCE WAS NOT NECESSARY TO ESTABLISHING THE EXISTENCE OF ANY STATUTORY AGGRAVATING FACTORS

¶119. Randall's next claims that the trial court committed reversible error by allowing the State to present the facts and details underlying Randall's prior convictions for capital murder and armed robbery. Randall claims that they were not relevant, and as such, denied him of his right to a fair trial under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article 3, sections 14, 26 and 28 of the Mississippi Constitution. Specifically, Randall finds error with (1) the introduction of a copy of an indictment as a part of the pen pack; and (2) certain testimony from an accomplice, Chris Payne, which elicited details of the prior capital murder.

¶120. The two aggravating circumstances submitted by the State were that (1) Randall was previously convicted of "another capital offense or of another felony involving the use or threat of violence to the person," and (2) the murder of Eugene Daniels was committed during the course of a robbery. Randall asserts first that the indictment for armed robbery was unnecessary because it did not prove a prior conviction. The indictment only proved that he was indicted for the offense. He tells us the only effect of its introduction was to highlight that it involved the use of a handgun. In support, he cites to *Bean v. Oklahoma*, 392 P.2d 753, 756 (Okla. Crim. App. 1964), which held that "the information does not prove the conviction but only that charge was filed. . .[and] is in no manner proof of a former conviction." *Id*. at 756. He next complains of the following portion of Payne's testimony:

Q. In fact, you and this defendant, Armon Randall, followed Kim Chi Le and her husband, Tim Bui from their store in Biloxi, to their home in Gulfport?

A. Yes, Sir.

Q. When they got to their home in Gulfport, when getting out of their van, Armon Randall went up to Mr. Bui, on the passenger side, along with yourself?

A. Yes, sir.

[colloquy on defense counsel's objection omitted]

Q. When y'all got up to the passenger side door, Miss Le was still in the driver's seat, wasn't she?

A. Yes, sir.

Q. And you hit Mr. Bui in the head with your gun?

A. Yes, sir.

Q. What did y'all get from that armed robbery and murder?

A. Not but a bag of cucumbers.

¶121. Randall refers us to our decisions in *Walker v. State*, 740 So.2d 873, 886 (Miss. 1999) and *Jackson v. State*, 672 So.2d 468, 487 (Miss. 1996) and reminds us that the State is limited during the penalty phase of trial to introducing evidence that is relevant and necessary to the existence of the aggravating circumstances. He asserts that the above quoted testimony and the indictment were irrelevant and prejudicial.

¶122. Randall concedes that under our decision in *Williams v. State*, 684 So.2d 1179, 1195-96 (Miss. 1996), "the jury must know at least some of the details of the prior conviction." However, he asserts that here, the details of his prior conviction were not necessary because capital murder and armed robbery are statutorily defined as aggravating circumstances. Thus, he argues that merely introducing the convictions is sufficient.

¶123. He first refers us to Miss. Code Ann. § 99-19-101(5)(b). This lists as an aggravating factor "another capital offense or another felony involving the use or threat of violence to the person." He tells us that because capital murder is *per se* a capital offense, a certified copy of the prior judgment "would have been more than sufficient" to satisfy the requisites of §101(5)(b).

¶124. He applies this same reasoning to his conviction for armed robbery. Miss. Code Ann. §97-3-79 defines armed robbery as "feloniously tak[ing] or attempt[ing] to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." Randall claims that because in *Wall v. State*, 718 So.2d 1107, 1114 (Miss. 1998); *Ashley v. State*, 538 So.2d 1181, 1185 (Miss. 1989); and *King v. State*, 527 So.2d 641, 646 (Miss. 1988), we said that "armed robbery is a crime of violence per se," nothing other than a prior armed robbery conviction is necessary.

¶125. He reminds us of *Russell v. State*, 670 So.2d 816 (Miss. 1995), where we said that "the trial judge is not required to go beyond the face of the certificate of conviction to determine the validity of a previous conviction."*Id*. at 831. The defendant in *Russell* presented an almost identical argument to the one Randall asserts now. Russell argued that his pen packs "contained information far beyond the mere existence of each of the [prior] convictions." *Id.* at 829. In *Russell* this Court compared the case before it to the case of *Cabello v. State,* 471 So.2d 332, 349 (Miss.1985), where the State introduced the following: a statement from the defendant indicating his birth date and that he had previously gone by the name James Kenna; copies of a bill of information showing that James Kenna had been convicted of armed robbery; copies of

court minutes showing that one James Kenna had been convicted of armed robbery on June 23, 1955; and a copy of his mug shot from the Louisiana State Penitentiary. *Id.* at 831.

¶126. The defendant complained that the introduction of his mug shot was reversible error. We disagreed and "recognized that while generally evidence of other crimes perpetrated by the accused is not admissible, this principle loses its significance in the sentencing phase of a capital murder case, when "[a] prior conviction 'of another capital offense or of a felony involving the use or threat of violence to the person' is admissible ... as an aggravating circumstance to be considered by the jury in determining punishment." *Id.* Although we did say that a trial judge is not required to go beyond the face of the document, we also said that "*we did not say that the trial judge was prohibited from doing so*."*Id.* (emphasis added). We placed great emphasis on the reason for which the pen pack was introduced i.e., to prove the existence of the statutory aggravators, and held that Russell's assignment of error was without merit. *Id.*

¶127. Randall next relies on our decision in *Jackson v. State*, 684, So.2d 1213, 1236 (Miss. 1996) where we said: "a certified copy of the judgement alone has been found by this Court to be sufficient evidence of a prior crime. *Berry v. State,* 575 So.2d 1, 14 (Miss.1990); *Minnick v. State,* 551 So.2d 77, 96 (Miss.1988), *rev'd on other grounds sub nom. Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) and thus "there was no basis for the circuit court to make extensive inquiry into the facts behind [the defendant's] prior conviction." However, Randall's reliance is again misplaced. The defendant in Jackson asserted the State had failed to prove the aggravating circumstance that he had committed a prior "felony involving the use or threat of violence to the person within the meaning of Miss. Code Ann. § 99-19-101(5)(b) in a lovers' triangle incident because the gun he had used was inoperable and separate kidnaping charges against him were dropped." *Id.* Thus, we said the above-quoted language in rejecting the argument that the State had failed to meet its burden of proof.

¶128. Randall next refers us to decisions of other jurisdictions where it is error to admit the details of a prior crime where the prior crime is by definition an aggravating circumstance. He cites to *Bigbee v. State*, 885 S.W.2d 797, 811 (Tenn. 1994); *Rhodes v. Florida*, 547 So.2d 1201, 1204-05 & n.6 (Fla. 1989); and *Perkins v. Alabama*, CR-93-1931, 1999 WL 1046438, at *81 (Ala. Crim. App. Nov. 19, 1999). However, both Randall and the State cite to our decision in *Williams v. State*, 684 So.2d 1179 (Miss. 1996), and *Williams* does answer the question.

¶129. In *Williams*, we said:

> As a general rule, "in the sentencing phase of a capital case, a prior conviction 'of another capital offense or of a felony involving the use or threat of violence to the person' is admissible ... as an aggravating circumstance to be considered by the jury in determining punishment." *Cabello v. State*, 471 So.2d 332, 347 (Miss.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986), citing *Gray v. State*, 351 So.2d 1342, 1345 (Miss.1977), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980); *See Johnson v. State*, 476 So.2d 1195, 1208 (Miss.1985).

> In *Cabello*, the Court was confronted with the issue of the use of a mug shot of the defendant used during the sentencing phase. We found that while "[t]he use of mug shots at trial is generally prohibited on the basis that the evidence of other crimes perpetrated by the accused is not admissible.... this principle loses significance in the sentencing phase of a capital case."*Cabello v. State*, 471 So.2d 332, 347 (Miss.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986). Likewise, while Williams' prior felony of armed robbery at trial is generally prohibited because such

may show the propensity by the accused to commit another similar crime, this principle loses significance in the sentencing phase of a capital case. Knowledge of a past crime is needed in order for the jury to consider whether an aggravating circumstance exists in determining punishment.

Williams' contention with this general rule is that while a prior offense may be introduced for sentence determining purposes, the prosecution cannot list the details of the prior conviction. Williams fears that telling the jury that he once before robbed a man while wielding a knife may lead the jury to believe that he has the propensity to use knives, and thereby link him to the knife used on Karen Ann Pierce. The trial judge entered into evidence duly authenticated copies of an indictment and commitment order reflecting a prior 1973 conviction of armed robbery with a knife. During oral arguments before this Court, Williams argued that the jury should have been provided with a certified copy of the conviction which merely told jurors of the existence of the prior felony involving the use or threat of violence to the person, minus the use of a knife.

Williams' argument is not only legally incorrect, it also places trial courts in a catch-22 of sorts, for the following reason: Before the jury can sentence a defendant to capital punishment, the jury must assess whether an aggravating circumstance exists. Miss. Code Ann. § 99-19-101 (Cum. Supp.1993). If "[t]he defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person," then such can constitute an aggravating factor. Miss. Code Ann. § 99-19-101(5)(b). Moreover the statute authorizes that "[i]n the [sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances." Miss. Code Ann. § 99-19- 101(1). The evidence offered for this purpose must meet the "beyond a reasonable doubt" standard of proof. In the sentencing phase of capital trials, statutory aggravating circumstances must be unanimously found beyond a reasonable doubt. *White v. State*, 532 So.2d 1207, 1219 (Miss.1988).

Thus, in order for the jury to assess whether an aggravating circumstance exists beyond a reasonable doubt, the jury must know at least some of the details of the prior conviction involving the use or threat of violence to the person. In order for twelve members to unanimously agree that a statutory aggravator under § 99-19-101 exists, they must be able to know about the crime that took place earlier, even if that crime indicates that the defendant has the propensity to commit crimes of violence wielding the same type weapon. Agreeing with Williams' contention further hamstrings a trial court by allowing a criminal defendant to later argue on appeal that the statutory aggravator of a "prior felony involving the use or threat of violence to the person" could not have been found unanimously beyond a reasonable doubt since the jury only looked at a sterile indictment, without reviewing the totality of facts surrounding the earlier felony. Because Williams' reasoning puts a trier in a catch-22, creating an opportunity to put the trial court in error when exercising either option, we decline to limit the trial court to submitting only an indictment which notes that the defendant committed armed robbery previously, and that armed robbery is a crime involving the use or threat of violence to the person.

This Court has previously addressed an argument similar to Williams' argument in *Nixon v. State*, 533 So.2d 1078 (Miss.1987), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). Nixon had previously been convicted of rape, and his previous conviction was being introduced in his capital murder case for sentencing purposes. Nixon's indictment order for the prior rape stated that he "assaulted and ravished" his victim. *Id.* at 1099. Nixon had pled guilty to the indictment. We acknowledged that those words "were not required." *Id.* at 1099. Nevertheless, "[w]

hen considering whether Nixon's prior offense was one involving the use or threat of violence the Court should be mindful that it behooves the prosecutor to prove the existence of each aggravating circumstance beyond a reasonable doubt." *Id.* at 1099. Likewise, in Williams' case, we ought to be mindful that the prosecutor still must prove an aggravating circumstance beyond a reasonable doubt, and that he should have enough leeway to do so.

Once the defendant has been convicted fairly in the guilt phase of a capital trial, the presumption of innocence disappears. *Delo v. Lashley*, 507 U.S. at 278, 113 S.Ct. at 1225-26 (1993). The procedural semantics engaged while determining guilt are not played so gingerly when determining sentencing. The purpose of a capital crime sentencing hearing is to determine whether the defendant deserves life, life imprisonment without the possibility of parole, or the death sentence. Common sense dictates that a death sentence is the enhanced step above a life imprisonment sentence. We have held that enhanced punishment relates to the conduct underlying the previous convictions. *Evans v. State*, 422 So.2d 737, 742 (Miss.1982), cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983). Thus, the jury must be able to know about the conduct underlying the previous conviction in order to assess that an aggravating circumstance exists, and thereby, appropriately return a sentence of death.

Taking Williams' argument to its logical end can best be found in the case of *Conner v. State*, 632 So.2d 1239 (Miss.1993). *Conner* also involved the issue of whether the trial court was in error for introducing prior crimes in the sentencing phase of a capital murder prosecution. In *Conner*, the trial court stated to the jury that "robbery is a crime of violence" when instructing the jury regarding the aggravating circumstance of a previous conviction for an offense involving the use or threat of violence. The robbery previously committed by the defendant Conner involved an attempt to snatch cash from a cash register in a store and the record did not indicate that Conner had a weapon on that occasion. Conner merely reached over the counter in the presence of the store clerk and seized the money from the cash register. Our statute defines the crime of robbery as the act of taking another's personal property "by violence ... or by putting such person in fear of some immediate injury to his person." Miss. Code Ann. § 97-3-73. If we applied Williams' version of what the trier should have done, then defendants like Conner would not have had the opportunity to tell the jury about the details of their previous conviction, in order for the jury to determine that an aggravating circumstance existed. Under Williams' suggestion, the *Conner* jury would only have been told that the defendant Conner was previously found guilty of committing a robbery and the statute defines robbery as an act involving the use or threat to the person. The jury could not have taken into account the details of the preceding events, and thereby, never have known that Conner did not brandish a weapon in taking the money out of the cash register.

In Conner's case, having the jury know the extent of his conduct in his previous conviction not only was needed so that they could unanimously determine beyond a reasonable doubt whether an aggravating circumstance existed, but also the jury's knowledge of the underlying details may have helped Conner because some members of the jury might have considered his past robbery as not amounting to an aggravating factor due to his lack of using a weapon. Thus, agreeing with Williams' contention may actually hurt defendants in some instances. Therefore, this Court declines to carve out a special exception for persons in Williams' position by limiting the trial judge to presenting the jury with only a clean, sterile record of the existence of the prior conviction.

The United States Supreme Court articulated this dilemma best in *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). Contrary to the opinion expressed by the Mississippi Supreme Court, the fact that petitioner served time in prison pursuant to an invalid conviction does not make the conviction itself relevant to the sentencing decision. The possible relevance of the conduct which gave rise to the assault charge is of no significance here because the jury was not presented with any evidence describing the conduct--the document submitted to the jury proved only the facts of conviction and confinement, nothing more. *Id.* at 585-86, 108 S.Ct. at 1986. Even the United States Supreme Court accepts the fact that the jury must be told at least the facts surrounding the previous conviction, and have the conduct described if relevant in sentencing.

Williams relies on the following cases for support, Foster v. State, 508 So.2d 1111, 1115 (Miss.1987), and Gallion v. State, 469 So.2d 1247, 1249 (Miss.1985). While Foster and Gallion both stand for the general proposition that when impeaching by proof of convictions, details of the crime are inadmissible, Williams' case has nothing to do with impeachment. Evidence of a prior conviction of armed robbery with a knife was given to the jury not to impeach, but rather to determine whether an aggravating circumstance existed. Again, nothing unnecessary was given to the jury. They were not told that the prior victim had his throat slashed or whether the prior victim's injuries resulted in death. They were only told that the weapon used in the armed robbery was a knife. Without proof of use of a weapon, there was no armed robbery, only simple robbery.

We find that the trial court committed no error in presenting to the jury the details of Williams' past crime which also involved a knife. Admission of such was not only relevant, it was needed so the jury could assess beyond a reasonable doubt that an aggravating circumstance existed from his conduct in his past criminal activity. We find this issue to be without merit.

*Williams*, 684 So.2d at 1195-97.

¶130. Based on the foregoing discussion, Randall's assignment of error is without merit. Almost every case cited in the discussion above contained, inter alia, an indictment introduced against the defendant during the sentencing phase. We never found such inadmissible. Additionally, the testimony of Chris Payne did not elicit unnecessary details. The jury was apprized of the basic facts from the first murder of which Randall was convicted. Given the State's burden of proof, the information introduced against Randall was necessary to prove the statutory aggravators. Consequently, this assignment of error is without merit.

¶131. Randall also asserts that even if we find that the details of his prior conviction are appropriate, that Miss. R. Evid. 403 still required their exclusion. However, as the State argues, Rules 101 and 1101(b)(3) state that the Rules of Evidence do not apply to sentencing hearings. Thus, this argument is also without merit.

## IV. WHETHER THE DEATH SENTENCE IS A DISPROPORTIONATE PENALTY GIVEN THE FACTS AND CIRCUMSTANCES OF THIS CASE AND IS NOT SUPPORTED BY THE JURY'S FINDINGS

### A. Whether the Trial Court's Jury Instruction S-10-B Was Improper

¶132. Randall next complains that the following jury instruction allowed the jury to sentence him to death with nothing more than tort foreseeability:

To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:

1. That the Defendant actually killed Eugene Daniels, or

2. That the Defendant contemplated that lethal force would be employed

3. That the Defendant attempted to kill Eugene Daniels

4. That the Defendant intend that a killing take place.

¶133. The State asserts that because Randall did not object to this instruction at trial, he is procedurally barred from raising this issue now. *Evans v. State*, 725 So.2d at 670. However, as Randall argues, our decisions in *Cole v. State*, 666 So.2d 767, 782 (Miss. 1995), *Pinkney v. State*, 602 So.2d 1177 (Miss. 1992), and *Clemons v. State*, 593 So.2d 1004, 1005 (Miss. 1992), allow us to address the merits of an otherwise procedurally barred issue where there is plain error in violation of constitutional rights.

¶134. Randall's argument begins by noting that the jury only found that Randall "contemplated that lethal force would be employed." He asserts that by merely quoting Miss. Code Ann. §99-19-101(7)(d), the jury was allowed to sentence him to death on nothing more than tort foreseeability. He relies on *White v. State*, 532 So.2d 1207 (Miss. 1988), which states:

> We are less than certain of the precise difference between Subsection (c), "the defendant intended that a killing take place," and Subsection (d), the defendant contemplated that lethal force would be employed." Subsection (c) has reference to the defendant's mental purpose and design that someone's life be taken. But what of Subsection (d)'s contemplation of lethal force? The two surely are not synonymous, although "contemplate" is one synonym for intend. See Roget's International Thesaurus §653.7 (4th ed. 1977). This alone excludes the notion that Subsections (c) and (d) describe two mutually exclusive categories of culpability.

> Careful attention to the King's English, definitional and grammatical, lead to the view that Subsection (c) is subsumed in Subsection (d), for we cannot imagine a case in which a defendant intended that a killing take place but somehow did not contemplate use of lethal force. In this sense, Subsection (c)'s "intended that a killing take place" is surplusage and may with profit be set aside. But the converse is not necessarily so. *One may contemplate lethal force while stopping short of a definite plan or design to kill. In a sense, Subsection (d) describes a contingent intent. Where, as a part of pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed, Subsection (d) is satisfied. On the other hand, mere tort foreseeability - - an objective, reasonable man approach - - falls well short of what the statute requires.*

*White*, 532 So.2d at 1220-21 (emphasis added).

¶135. Randall asserts that because the jury found "contemplation" alone, the language of *White* required the jury to find that he had some sort of "pre-crime," "contingent intent," or plan that establishes a mental state beyond mere foreseeability or reckless indifference to human life. We agree. The State notes that the jury sent the trial judge a note stating: "Judge, our question is on Section A. Must we all unanimously agree on the same number 1, 2, 3, or 4 in Section A ," to which the judge responded "Yes, you must all unanimously agree on the same one or more of numbers 1, 2, 3, or 4 in Section A in order to proceed to Section B."

Yet, this fails to cure the fatal flaw with the instruction. The testimony at trial was that the parties who were involved intended to commit a robbery. While there was testimony that Randall was armed, the jury did not find that Randall actually killed Daniels, attempted to kill Daniels, or intended that a killing take place. Because the instruction failed to properly instruct the jury on the mental state required, this instruction was erroneously given.

### B. Whether the Evidence Was Insufficient to Support a Finding that Randall Contemplated that Lethal Force Would be Employed.

¶136. Randall next asserts that even if we find that the jury was properly instructed, the evidence presented by the State was insufficient to sustain a finding that he contemplated that lethal force would be employed. We agree.

¶137. On appeal, "we review the evidence and reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the [jury] verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt." *White v. State*, 532 So.2d 1207, 1220 (Miss. 1988). This is the guide for testing the legal sufficiency of the evidence to support a finding under §99-19-101(7). *Smith v. State*, 729 So.2d 1191, 1218 (Miss. 1998).

¶138. Randall again compares the facts of his case to those in *White v. State*, 532 So.2d 1207 (Miss. 1988). The defendant and his brother were convicted for the murder of a grocery store owner. The owner was killed during a robbery and witnesses saw the defendant fleeing the scene with a gun in his hand. Randall emphasizes that although we found this was sufficient under our felony-murder statute, we said: "it was enough that [defendant] was an active participant in the robbery of Poo-Nannie's Café in the course of which Lewis was killed by one of the participants. Our Legislature has directed, however, that greater culpability be required before the penalty of death may be inflicted." *White*, 532 So.2d at 1221. Randall also draws our attention to the fact that we found there was "no indication which robber killed [the victim], or that any of the three contemplated in advance that lethal force would be employed." *Id.*

¶139. Such is the case here. Randall argues that the alleged plan between the group was to steal cocaine and money from the apartment. No one expected Daniels to be home. Instead, they contemplated Cowart to open the door, and hoped that once she recognized Johnson, she would open the door. Randall further argues that according to the State's witnesses, Randall did not even confront Daniels initially, but rummaged through the apartment looking for the cocaine. All of the State's witnesses testified that Daniels was shot following his attack on Thomas. After Daniels grabbed Thomas, Williams began to yell that "he [Daniels] was going to kill him [Thomas]."

¶140. The State argues that the facts show that Randall, along with his co-defendants, planned the robbery, that he was armed, that he held Daniels at gunpoint, and that Randall and Stokes approached the victim with guns drawn when Daniels grabbed Thomas. Thus, according to the State, this was sufficient to give rise to the reasonable inference that Randall "included in his plans the substantial probability that lethal force would be used during the commission of the armed robbery to insure the robbery's success and to avoid arrest."*Smith v. State*, 729 So.2d 1191, 1218 (Miss. 1998)(quoting *Abram*, 606 So.2d at 1043). However, as Randall argues, the jury did not find beyond a reasonable doubt that Randall killed Daniels, that Randall attempted to kill Daniels, or that Randall intended that a killing take place.

¶141. The mere possession of a gun when there is no evidence that there was a plan to kill, although sufficient under the felony-murder statute, does not establish that there was a "substantial probability that fatal force will be employed." *White*, 532 So.2d at 1220.

### C. Whether Death is a Disproportionate Penalty in This Case

¶142. Under Miss. Code Ann. § 99-19-105(3)(c), we must consider "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We agree with Randall that the death sentence is disproportionate here.

¶143. Randall reminds us of *Bullock v. State*, 525 So.2d 764, 770 (Miss. 1987) where we said that "Our point is this: when you review all of the other capital cases decided since Bullock, no capital defendant has had a death sentence affirmed in this state where the sole finding was that he contemplated lethal force. James Stringer, Sr.'s death." Although the State cites to a whole host of cases to show that the death sentence was not disproportionate, Randall correctly asserts that all of the cases relied on by the State involve a defendant who was (1) found to have killed, attempted to kill and/or intended to kill, (2) was at least the "instigator" or mastermind of the crime, and/or (3) the co-defendant was also sentenced to death or was not subject to sentencing by a jury. While the co-defendants testified that Randall and Stokes both pointed guns at Daniels, there is no proof as to who actually killed him. The jury specifically declined to find that Randall killed or attempted to kill Daniels. Additionally, Stokes only received life in prison and the other co-defendants entered into plea agreements which spared their lives. Because the only fact, as found by the jury, was that Randall "contemplated" lethal force, the death sentence was disproportionate based on the findings of fact as determined by the jury. However, on retrial, other facts may be developed sufficient to support a death sentence.

### IV. WHETHER THE ERRORS TAKEN TOGETHER ARE CAUSE FOR REVERSAL

¶144. Randall's last assertion of error is that, with respect to the penalty phase of Randall's trial, the cumulative effect of the errors require a reversal when they deny the defendant the right to a fair trial. *Williams v. State*, 445 So.2d 798, 814 (Miss. 1984). He also reminds us that "the fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). The impact of many "near errors" will have a greater impact in a capital case. *Id.* For the foregoing reasons as discussed in this "Part Two," we agree.

### CONCLUSION

¶145. For these reasons, the judgment of the Harrison County Circuit Court is reversed, and this case is remanded to that court for a new trial consistent with this opinion.

¶146. **REVERSED AND REMANDED.**

> **PITTMAN, C.J., SMITH, AND COBB, JJ., CONCUR. DIAZ, J., CONCURS IN PART. McRAE, P.J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE OPINION. BANKS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION JOINED BY McRAE, P.J., WALLER AND DIAZ, JJ.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶147. I agree with the result reached by the majority. I write separately to note my disagreement with the disposition of the issue regarding the testimony of a co-defendant in a wholly separate crime regarding the details because the details of the crime are not at issue in the instant case.

¶148. One of the statutory aggravating factors alleged by the state is that Randall has been previously convicted of another capital offense or of a felony involving the use or threat of violence to the person. Miss. Code Ann. § 99-19-101 (5)(b). The previous crimes here alleged are capital murder and armed robbery. Capital murder is by definition a capital offense. Likewise, armed robbery is a crime which, as a matter of law, involves the use of threat or violence. Miss. Code Ann. **§** 97-3-79. This Court has repeatedly held that armed robbery is a crime of violence per se. *Wall v. State*, 718 So. 2d 1107, 1114 (Miss. 1998); *Ashley v. State*, 538 So.2d 1181, 1185 (Miss.1989); *King v. State*, 527 So.2d 641, 646 (Miss.1988)). In *Connor v. State*, this Court approved an instruction to that effect in a capital sentencing hearing. 632 So. 2d 1239, 1268 (Miss. 1993). Clearly, then there is no need for testimony as to the details of the crime in order to meet the prosecution's burden of proof. These crimes are irrebutably within the statute.

¶149. The majority suggests that we are bound by our decision in *Williams v. State,* 684 So.2d 1179 (Miss. 1996), to approve this evidence. I disagree. Beyond its approval of the use of the indictment to show the nature of the crime charged, the *Williams* decision is flawed. It proceeds on the fallacious premise that unless the state is allowed to present the details of the previous crime, defendants would be barred from presenting evidence that they did not engage in violence. *Connor* was cited as an example. There the previous offense was neither robbery nor armed robbery but attempted robbery. There is an initial question whether an attempted robbery is a per se crime of violence which this Court in *Connor*, answered in the affirmative. 632 So. 2d 1239, 1268 (Miss. 1993). More importantly to the present analysis, however, is the fact that based upon the conclusion, the *Connor* court approved an instruction that robbery is a crime of violence as a matter of law. *Id.* It follows that no defendant may successfully argue otherwise. There is no need for the state to show details when it is entitled to an instruction that the crime is one of violence as a matter of law. Had the crime been one for which no such instruction would be proper, the situation would be different.

¶150. Additionally, there is nothing in *Connor* or any other decision of this Court, nor in the defendant's argument, which would prevent a *defendant* from raising the details of the previous conviction in an attempt to mitigate the effect of its disclosure. Of course, should a defendant do so, the state would be allowed to explore those details, not to prove the conviction, but to the extent necessary to address those aspects of the details which the defendant offers in mitigation.

¶151. The *Williams* court's reliance on what the United States Supreme Court said in *Johnson* is equally flawed. 684 So.2d 1179, 1197 (Miss. 1996). That court merely held that the state may not rely upon the fact of a conviction which has been overturned. *Johnson v. Mississippi,* 486 U.S. 578, 585-86, 108 S.Ct. 1981, 1986 (1988). It expressed no opinion as to whether the conduct of the defendant which gave rise to that conviction might be relevant to the sentencing inquiry. *Id.* Clearly that conduct is not relevant to whether he had been convicted which is the statutory aggravator at play there and here. In order to be relevant that conduct must either relate to another aggravating factor or be offered to rebut mitigating evidence.

¶152. Based on the foregoing analysis, where a defendant has been convicted of a crime which meets the criteria for the aggravator per se, such that the state is entitled to an instruction to that effect even the indictment is suspect as necessary to prove the nature of the offense. Clearly, however, the "some details" language in *Williams* should not be construed so broadly as to encompass the Payne testimony here. Where the previous felony conviction may have involved a threat of violence which would not be shown from a mere reading of the indictment or record of the conviction. "Some detail" should be allowed in such a case to show that the statutory requisite for an aggravator is met. Where, as here, the crimes are both capital and per se violent, however, no such detail is required to show that the aggravator exists. The only evidence beyond the indictment and record of conviction required is some proof that the person named in those papers is the person here on trial. A mug shot from the prior case file may serve that purpose. Absent a stipulation, the testimony of an accomplice, a court officer or some other person with knowledge should suffice to meet the element of identification. There is no reason, however, to go into the details of that other crime because such details are not relevant to either identity, the fact of conviction, or the requisite nature of the crime.

¶153. Because these details lack relevance and are also prejudicial they violate our capital sentencing scheme and due process of law. I would instruct the trial court to exclude the Payne testimony on remand.

**McRAE, P.J., WALLER AND DIAZ, JJ., JOIN THIS OPINION.**

1. The record reflects Randall advised the Court, and thus the State, in chambers on day one that he would be taking the position that Van Court would be unavailable. However, Judge Walker emphasized for the record that no motion was made and no arguments were heard in chambers on that first day.

2. The State argued before the trial court that the State's inability to cross-examine Van Court would violate its confrontation rights. However, we have said that "[i]t is well established by prior decision[s] of this Court that the right of confrontation under the Sixth Amendment of the United States Constitution and the Mississippi Constitution does not inure to the benefit of the State in prosecuting criminal cases." *Butler v. State*, 702 So.2d 125, 129 (Miss. 1997). *See also Parker*, 606 So.2d at 1139.

3. Le was the murder victim in the case of Randall's first capital murder conviction.